803 A.2d 1074

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. DARON JOSEPHS, DEFENDANT–APPELLANT.

Argued October 23, 2001—Decided July 15, 2002.

48

50

54

*Robert L. Sloan* and *Susan C. Green,* Assistant Deputy Public Defenders, argued the cause for appellant (*Peter A. Garcia,* Acting Public Defender, attorney; *Mr. Sloan, Ms. Green, Claudia Van Wyk,* Deputy Public Defender II, *Bernadette N. DeCastro* and *Mordecai D. Garelick,* Assistant Deputy Public Defenders, of counsel and on the briefs).

*Daniel I. Bornstein,* Deputy Attorney General, argued the cause for respondent (*John J. Farmer, Jr.,* Attorney General of New Jersey, attorney).

*John J. Gibbons,* argued the cause for amici curiae, Association of Criminal Defense Lawyers of New Jersey, American Civil Liberties Union of New Jersey and New Jerseyans for a Death Penalty Moratorium (*Gibbons, Del Deo, Dolan, Griffinger & Vecchione,* attorneys; *Mr. Gibbons, Lawrence S. Lustberg* and *Jessica A. Roth,* on the brief).

The opinion of the Court was delivered by

LaVECCHIA, J.

### Table of Contents

Introduction..........................................65
I. Facts and Procedural History .......................66
II. Asserted Guilt–Phase Errors ........................79
 A. Failure to Prove Own–Conduct Murder ...........79
 B. Sequential Instruction to Jury on Own–Conduct Murder and Accomplice Liability ...........86
 C. Other Alleged Guilt–Phase Instruction Errors......96
 1. Instruction on Serious–Bodily–Injury Murder ...................................96
 2. Additional Asserted Instruction Errors.......101
 a. Self–Defense/Defense of Others ..........101
 b. Passion/Provocation.....................103
 D. Guilt–Phase Voir Dire Inadequacy ...............104
III. Penalty–Phase Errors ..............................105
 A. Penalty–Phase Jury Selection....................106
 1. Reference to Appellate Process..............106
 2. Excusal of Juror Based on Views on Death Penalty ..........................109
 B. Conduct of Penalty–Phase Trial..................110
 1. Failure to Prove Aggravating Factor 4(g).....110
 2. Exclusion of Testimony Criticizing State's Evidence ...............................115
 3. Improper Introduction of Evidence of Similarity of Prior Murder.................116
 4. Introduction of Inflammatory Victim–Impact Evidence...........................122
 5. Prosecutor's Remarks During Summation.....122
 a. Remarks About Duty to Society ..........125
 b. Remarks About Experience as a Prosecutor..........................125
 c. Remarks About Failure to Testify ........126

 d. Remarks About Inadequacies of De-
 fense Expert ........................ 127
 e. Remarks About Defendant's Relation-
 ship with Son ....................... 128
 C. Alleged Error in Jury Charge During Penalty
 Phase ...................................... 129
 D. Penalty–Phase Jury's Alleged Failure to Vote
 Individually on Aggravating Factors ........... 131
IV. Additional Issues ................................. 135
 A. Standard of Proof of Circumstantial Evidence
 for By–Own Conduct Murder .................. 135
 B. Constitutionality of New Jersey Death Penalty
 Statute .................................... 137
V. Conclusion ...................................... 142

A Camden jury convicted defendant Daron Josephs of purposeful or knowing murder by his own conduct of Leon Mitchell and Barrington McLean, conspiracy to murder Mitchell, McLean, Christine Williams, and Emil Josephs, and related weapon-possession offenses. A separate jury sentenced defendant to death for the murder of Mitchell and McLean. In this appeal, defendant claims error in both the guilt and penalty phases of his trial. He also asserts that his capital sentence is disproportionate and should be vacated.

We affirm defendant's non-capital convictions. Also, defendant's convictions of purposeful or knowing murder of McLean and Mitchell are sustained. Because of error affecting the by own-conduct determinations, we hold that defendant's death eligibility cannot be sustained. Although error in the own-conduct instruction requires reversal of the death sentences, that does not affect defendant's conviction of the murders provided the State is willing to accept non-capital sentences. However, if the State intends on remand to seek again capital sentences for the murders, then defendant's guilt by his own conduct will have to be proven beyond a reasonable doubt in a second guilt-phase trial. As a consequence of our disposition, we need not and do not engage in proportionality review. We also reaffirm our case law upholding the constitutionality of New Jersey's death penalty statute.

## I.

### Facts and Procedural History

The shootings that caused the deaths of Mitchell, McLean, and Williams on January 22, 1995, resulted from a dispute among brothers and friends involved in a marijuana distribution operation led by Emil Josephs. Emil lived in Camden in an apartment located at 3212 Federal Street. Residing with him at the time were his brother, Turan Josephs (TJ), and his friend Barrington McLean. The apartment occupied the second floor and attic of a house. On the second floor were two bedrooms, a kitchen, and one bathroom. McLean and TJ slept in the second floor bedroom located at the front of the house. Emil used the attic as his bedroom.

Although drugs were not distributed from the apartment, Emil kept a quantity of marijuana in a compartment under the stairs leading to the attic. Significant amounts of cash also were kept in the house at times. The drug-dealing business had become very busy around the end-of-year holidays in 1994, taking in approximately $15,000 per week at the time of the shootings. Emil shared the profits with McLean and TJ, allowing them a one-third share to split between themselves.

Sometime during December 1994, defendant (whose nickname is Dee) and Hugh Josephs Jr. (nicknamed Junior), Emil's half-brothers, moved into the apartment because they had agreed to install carpeting for Emil. It is noteworthy that defendant and Junior arrived in a red Honda Civic that they used while they remained at the apartment on Federal Street. In terms of familial relations, we also note that Emil, TJ, defendant, and Junior share the same father, Hugh Josephs Sr.; however, Emil and TJ have a different mother from defendant and Junior.

Junior was promised $2500, and defendant $1500, to lay the carpeting. Lacking sufficient cash to pay them in full, Emil compensated Junior and defendant with marijuana to sell. The profits from those sales were sufficient to serve as payment for

the carpet work. Junior and defendant then stayed on at the apartment, joining Emil's marijuana distribution business by selling for him at a designated location. Emil also enlisted Leon Mitchell and Christine Williams to become involved in the business. They too stayed at the apartment on Federal Street.

Emil was the only person present in the apartment on the evening of Saturday, January 21, 1995, who testified at defendant's trial. Other than defendant, and Junior, whose whereabouts are unknown, all of the others present were killed. According to Emil's testimony, on that Saturday he learned from his friend, "Bloody" (a business associate in the marijuana business), that defendant and Junior were selling marijuana purchased from another source, and that they were selling the other drugs at Emil's sales location. Apparently, the two were pocketing the money from those sales. Selling marijuana purchased from another distributor was contrary to Emil's direct orders to defendant and Junior when he allowed them to deal drugs for him.

Emil returned to the apartment that evening to find McLean, Mitchell, defendant, and Junior sitting in the kitchen. He had directed defendant and Junior to leave their designated sales post and to meet him back at the apartment. Emil described himself as enraged because defendant and Junior had not followed his orders. He told them they were "out of the business." The heated verbal confrontation escalated as Junior and Emil began to scuffle. Brandishing a kitchen knife, defendant approached Emil from behind, but he was disarmed by McLean. Emil ordered Junior and defendant to leave his house, and then proceeded into their bedroom where he took a nine millimeter and .45 caliber gun from their bags and began to pack their clothes. Mitchell interceded and persuaded Emil to let defendant and Junior stay for the remainder of the night because it was past midnight. Nonetheless, Emil took the two guns with him to the attic where he had a third gun, a .357. Normally, a gun would be kept under the kitchen sink for "emergencies."

Emil left his attic bedroom several times that night. The first time he took all three guns with him while he showered before retiring. Again, at approximately one in the morning he went downstairs to use the bathroom, that time taking only the nine millimeter. As he passed by, he saw defendant and Junior awake and sitting on the floor in the bedroom they were using. Emil then encountered McLean in the kitchen, awake and upset over the evening's events. Emil left the nine millimeter with McLean as a show of "respect." Emil did not want McLean to think that he intended to disarm him when all of the guns were moved to Emil's attic room.

Sometime between five and six o'clock in the morning, Emil, dressed only in a tee shirt, underwear, and slippers, went downstairs. He saw defendant and Junior fully dressed in their room as he again passed by. Emil proceeded to the kitchen where he met up with Mitchell and Williams. After a brief time, Mitchell left the room, leaving behind Williams and Emil. Not long thereafter, Junior came in the room. Emil testified that although he was not paying close attention to what Junior was doing, he was aware that Junior went by the sink and then left the room, walking in a hunched-over manner. As noted, a gun typically had been kept in the cabinet under the sink.

Junior then reentered the room, and Williams screamed as he pointed the nine millimeter gun at Emil and stated "What's up now?" Emil asked him if he was going to shoot. Junior proceeded to pull the trigger, but the gun did not fire. While Junior reloaded, Emil jumped through a kitchen window, breaking the glass as he did. He landed, bleeding, in an alley. His neighbors, Delores Morrison and Raymond Mann, were in the alley at the time. They heard the breaking glass and saw Emil covered with blood from gashes on his leg and arm. He told them that he was in a fight and that someone was trying to kill him.

According to Emil, as he ran away from his apartment, he heard three shots, a pause, and then additional shots. He stated that he believed the shots sounded as if coming from different guns. He

ran back to his neighbors and asked them if they heard the shots. Morrison said that she did. She also gave him a towel from her laundry basket to wrap around his wounds. Morrison said that she was going to call the police and went inside. Emil waited a few moments, but when Morrison did not return, he left. Morrison emerged from her apartment not long thereafter and found that Emil had left. She then observed two men leave the front door of Emil's apartment. She described them as fair skinned, perhaps Asian, stocky, and of medium height. Compared to the man who jumped out of the window, whom she described as approximately her height, (5'5" or 5'6"), she assessed the other two men as a bit taller. She observed the two men walk down the sidewalk, turn the corner, and disappear.

Emil hitched a ride to the apartment of his friend, Bloody, who arranged for friends to take Emil to New York. Bloody then drove to Philadelphia Airport to pick up TJ and Lorna Palmer, who were returning from Texas with some marijuana for Emil. He dropped them off at Emil's apartment. We note here that Bloody died before trial and, therefore, we have only TJ's recitation concerning these events.

Because TJ had forgotten his keys, he rang the doorbell. When no one answered, Palmer left. TJ then proceeded to climb into the apartment through one of the two kitchen windows, noticing the broken glass on the ground below the windows. TJ found food cooking on the stove and then discovered that Mitchell, McLean, and Williams had been shot to death. Not wanting to be involved in the shootings, TJ removed his personal items from the apartment. He then reported the murders to the police by calling from a pay phone and by flagging down a patrol car. He also contacted a police officer he knew through a friend.

Upon arrival, the police found no sign of forced entry. The three bodies were found in different locations in the apartment. McLean's body was in the front bedroom. Williams's body was found in a crouched position in a corner of the bathroom. Mitch-

ell's body was at the top of the stairs lying on a shower curtain still attached to its rod that had been pulled from its moorings.

### The Investigation and Arrest

Dr. Robert Catherman, a medical examiner for Camden County, performed autopsies on all three victims. The autopsy on McLean revealed that he had been shot six times. The first bullet entered the top right side of McLean's head at a sharp downward angle, fracturing his skull and causing acute damage to his brain. The second shot went through McLean's face, obliterated his right eye, and exited through his left cheek. It caused bruising to the adjacent lobes of McLean's brain. The third shot entered the back of his left thigh, pierced his scrotum, and then entered and exited his right thigh. The fourth shot entered the back of McLean's upper right thigh and cut through his abdomen. That bullet ruptured his intestine, fractured his right femur, broke his thigh bone, and damaged his colon. The fifth and sixth shots entered and exited McLean's right hand and appeared to be defensive wounds. McLean also suffered eight blunt force injuries, all of which were consistent with having been inflicted by a steam iron. Four of the injuries were to his hands and arms and appeared to be defensive wounds. The other four injuries were inflicted to his head. The head injuries went through the scalp and down to his skull. They did not cause bone damage but may have been sufficient to render McLean unconscious.

The cause of death for McLean was the combined effects of the gunshot wounds that involved the head, trunk, right and left legs, the right arm and hand, and, to some extent, the blunt force injuries to his head. The bullet from the first shot was recovered from the base of McLean's skull and was identified as a .38 caliber class metal-jacketed lead projectile. The bullet from the fourth shot was recovered from McLean's abdominal wall and was identified as a nine millimeter projectile. Two more bullets were embedded in the carpet directly under McLean's body: a nine millimeter projectile was found under McLean's lower chest, and a .45 caliber projectile was found under McLean's lower abdominal

area. Also in the room were two discharged nine millimeter cartridge cases, a discharged .45 caliber cartridge case, and a steam iron. The gunshot wounds were all inflicted from a distance of a little more than a foot and a half.

The autopsy on Mitchell revealed that he had been shot four times. The first shot entered the left side of the front of Mitchell's chest, shattered his spinal column and cord, damaged his liver, stomach, duodenum, and pancreas, and exited through the lower right side of his back. The second shot went through his face and bruised the lobes of his brain. The third shot went through the left side of Mitchell's cheek, also bruised the lobes of his brain, and exited through the jaw. The fourth shot entered his lower lip, shattered his upper jaw, and exited in front of his right ear. There was stippling surrounding the second and third gunshot wounds, indicating that they had been fired at close range. Dr. Catherman found that the cause of Mitchell's death was a combination of all four wounds. There were three defects in the carpeting under Mitchell's body. One of the defects, located under Mitchell's torso, was caused by a projectile that was smaller than a .45 caliber projectile, such as a nine millimeter projectile. The other two defects were under Mitchell's head. They were caused by .45 caliber projectiles. The lead core of a nine millimeter projectile was in Mitchell's hair, near his fourth exit wound, and the jacketing that had surrounded the lead core was in the fourth exit wound.

The autopsy on Williams revealed that she had been shot twice in the head. The first shot struck the bridge of her nose, passed through her face, and exited on the left side of her cheek. There was stippling surrounding the entrance wound, suggesting that the shot had been fired at close range. The second shot entered through the top of Williams's head, passed through her skull and brain, and proceeded on an acutely downward angle through the base of the skull and into the neck. The sharp downward angle of this shot suggested that Williams's head had been flexed against her chest, and that the gun had been pointed directly at the top of

Williams's head. This wound had no evidence of residue and was fired from a distance of at least a foot and a half. Two nine millimeter bullets were recovered: one from her chest and the other near her body in the bathroom. A discharged nine millimeter Luger cartridge case also was found near her body.

Sergeant Gerald Burkhart of the New Jersey State Police, an expert in ballistics and firearms identification, determined that three different firearms were responsible for discharging the bullets and shells recovered from the scene and from the victims' bodies. The nine-millimeter-discharged bullets and shells had been fired from one gun, the .45–caliber–discharged bullets and shells had been fired from a second gun, and the .38–caliber–class–discharged bullet, recovered from the base of McLean's skull, had been fired from a third gun, possibly a .357 revolver. Concerning the discharged shells, Sergeant Burkhart testified that they fell into two distinct groupings indicating that they were fired from two guns. He also stated that there is a difference in how different guns sound when discharged.

During cross-examination of Detective Michael Aaron, it was revealed that some of the ballistic casings had been picked up by investigators with bare hands and that no effort was made to test the casings for fingerprints. Sergeant Burkhart did not test the projectiles for fingerprints either. Detective Aaron explained that the preferred method of testing for fingerprints could compromise the ballistics testing that connects ammunition and the gun from which it was fired. He stated further that he did not conduct any of the tests used to determine whether a victim handled or fired a weapon because those tests can yield a positive result when the victim was simply in the same room as a fired gun.

The police did not find useable latent fingerprints in the kitchen, bathroom, or third floor. No cash or firearms were found in the apartment. The police found another discharged nine millimeter cartridge case; a black leather jacket and an electronic organizer, both of which belonged to defendant; two battery operated digital scales; a white plastic bag filled with numerous small- and medi-

um-sized transparent bags typically used for packaging controlled substances; a pillow with a bloody footprint on it in the attic; a knife sticking out from the top of a roll of carpet padding in the second floor hallway; a brown paper bag containing twenty-five small plastic bags filled with what appeared to be marijuana; and some drug ledgers in McLean's handwriting. Forensic tests confirmed that a window in the kitchen had been broken from the inside and that there was human blood and flesh on the glass.

Fonceta Young was interviewed by the police. Young lived in the first floor apartment at 3212 Federal Street. She did not know the people who lived in the second–floor apartment. While she was watching television that morning, she heard "thumping" noises coming from the second–floor apartment. She described the sound to be like "wrestling" or "playing." After about six or seven seconds of that noise, Young heard seven to nine "tapping" sounds. She thought her upstairs neighbors were having a "domestic argument." Approximately fifteen minutes after that noise ended, she heard the sound of footsteps running down the stairs from the second floor to the ground level. She also heard a man's voice saying, as if in a hurry, "Come on, Dee. Dee, come on."

Joyce Poole also was interviewed. Her home shared a common wall with the house located at 3212 Federal Street. Poole was upstairs when she heard what sounded like "bumping" noises coming from the other side of the common wall. She thought it was the sound of men fighting. She then heard sounds like a jack hammer coming from the apartment. The events she described lasted between ten and fifteen minutes.

Sandra Delgado lived across the street. Although she did not hear gunshots she heard the sound of shattering glass, and when she looked out her window she saw someone speaking to Morrison. She watched as Morrison handed something to the man. Delgado said she went back to bed not thinking that what she had witnessed was significant. Delgado did not know the people living at 3212 Federal Street, but on one occasion she had seen a stream

of people, who drove luxury cars with out-of-state license plates, going in and out of the apartment.

At approximately 9:30 a.m. on the morning of the murders Detective Jeffrey Frampton and Officer Shane Sampson were on patrol in Camden. A red Honda Civic approached their car and then made a sudden stop. A black male, who appeared to be 5'6" or 5'7", got out of the car and fled into the neighboring town of Pennsauken. The driver of the Honda then proceeded at high speed in the wrong direction on a one-way street. Frampton and Sampson activated their siren and pursued the Honda until another vehicle cut them off. Believing that they were pursuing a stolen vehicle, they radioed their fellow officers to watch for the Honda. Another unit found the car approximately fifteen minutes later, abandoned at a nearby street corner where it had struck a fire hydrant. The officers took down the vehicle information and impounded the car because it had not been reported as stolen.

The following month Emil returned to Camden and was apprehended by the police. He was interviewed and his wounds photographed. Charged as a fugitive from Texas, Emil was held in the Camden County Jail.

In early March 1995, police obtained arrest warrants for defendant and Junior and a search warrant for their mother's house in Brooklyn. When the search warrant was executed, the police found a letter from the City of Camden indicating that on January 22, 1995, a 1986 Honda Civic with New York license plates had been recovered in Camden and was being held by the Camden Police Department. They also found letters from the Camden County Prosecutor's Office to defendant and Junior, informing them that there were charges pending against them in Camden.

The police obtained a search warrant for the vehicle, which had been taken to a towing and salvage yard. On the seat, police found ignition keys, a large black leather hat, and a pair of sunglasses. No evidence of drugs, drug paraphernalia, or bloodstains were found. The hat was taken because it fit Morrison's description of the hats worn by the men she saw leaving 3212

Federal Street shortly after the shots were fired. Emil later identified the sunglasses as belonging to defendant, and the hat as belonging to Junior.

*Pre–Trial and Guilt–Phase Proceedings*

On February 25, 1998, Camden County Indictment Number 803–02–98 charged defendant with the following offenses: first-degree purposeful or knowing murder of Barrington McLean by his own conduct, in violation of *N.J.S.A.* 2C:11–3a(1) and (2) (Count One); first-degree purposeful or knowing murder of Leon Mitchell by his own conduct (Count Two); first-degree purposeful or knowing murder of Christine Williams, not by his own conduct (Count Three); first-degree attempted murder of Emil Josephs, in violation of *N.J.S.A.* 2C:11–3a (Count Four); second-degree aggravated assault of Emil Josephs, in violation of *N.J.S.A.* 2C:12–1b(1) (Count Five); conspiracy to murder Emil Josephs, Barrington McLean, Leon Mitchell, and Christine Williams, in violation of *N.J.S.A.* 2C:5–2 (Counts Six, Seven, Eight, and Nine, respectively); second-degree possession of a firearm for an unlawful purpose, in violation of *N.J.S.A.* 2C:39–4a (Count Ten); and third-degree possession of a handgun without a permit, in violation of *N.J.S.A.* 2C:39–5b (Count Eleven).

In seeking the death penalty, the State informed defendant that it would establish that defendant had been previously convicted of another murder, an aggravating factor pursuant to *N.J.S.A.* 2C:11–3c(4)(a), and that the offenses were committed while defendant was engaged in the commission of or attempting to commit murder, *N.J.S.A.* 2C:11–3c(4)(g) (the murder-within-murder aggravating factor).

To avoid the guilt-phase jury from being impermissibly influenced by defendant's prior murder conviction, separate juries were empaneled for the guilt and penalty phases. The guilt-phase trial was conducted from June 2, 1998 through June 25, 1998. A number of items were admitted into evidence over the objection of defendant. The jury observed the victims' bloody clothing, including some underwear; graphic autopsy photographs; and an in-

court demonstration of handguns by the State. The State's case was comprised of the testimony of Emil and TJ, the neighbors who met or saw Emil the morning of the murders, representatives of the medical examiner's office, investigating officers, and ballistics experts. Defendant chose not to testify at trial and requested that the jury be charged on the issue.

Defendant was acquitted of the murder of Williams and the attempted murder and aggravated assault of Emil. He was found guilty of the capital murder of McLean and Mitchell, of conspiracy to murder McLean, Mitchell, Emil, and Williams, possession of a firearm for an unlawful purpose, and unlawful possession of a handgun. On April 5, 1999, defendant's motion for a judgment of acquittal or, in the alternative, a new trial, was denied.

### Penalty Phase

There were several pre-penalty-phase motions. The court granted the State's motion for consolidation of several mitigating factors and also ruled that the State did not have to re-prove the elements of murder to establish aggravating factor 4(g).

The State also moved to exclude the proposed testimony of defense witness Professor Marilyn Miller, a forensic science expert. Professor Miller was engaged by the defense to conduct an evaluation of the physical evidence and to present a crime-scene reconstruction for the penalty-phase jury. Because the penalty-phase jury was not present for the guilt-phase presentation of evidence, Professor Miller would have explained to the second jury defendant's position on the inadequacy of the State's investigation of the physical evidence and the State's failure to preserve the evidence. The defense argued that Professor Miller's testimony was relevant to the circumstances of the crime generally, defendant's lesser role in the crime compared to Junior, possible provocation by the victims, and the State's burden to prove the 4(g) aggravating factor of murder committed in the course of a murder. The trial court concluded that the proposed testimony of Professor Miller was irrelevant to the sentencing phase because it pertained only to a guilt-phase issue; that it was not relevant to

the mitigating factors or to the circumstances of the offense; that it would not assist the jury in evaluating defendant's culpability as compared to that of Junior; and that it would not raise doubts concerning the 4(g) aggravating factor. Accordingly, Professor Miller was not permitted to testify.

The trial court also granted defendant's motion to withhold from the penalty-phase jury the determination of the guilt-phase jury that defendant was guilty of murder by his own conduct. Counsel explained that defendant intended to argue as a mitigating factor that he played a lesser role in the offense than Junior. Although the trial court granted defendant's motion, the court additionally instructed the jury that it was not to doubt defendant's guilt of the murders of Mitchell and McLean. Lastly, the trial court ruled that the State could rely on the transcript of the guilt-phase testimony of Emil Josephs because he was unavailable to testify during the penalty phase.

The penalty-phase trial began on March 21, 2000. As noted, the State relied on two aggravating factors: that defendant had been convicted, at some other time, of murder; and that the offenses were committed while defendant was engaged in the commission of murder. For the first aggravating factor, the State relied on testimony from the district attorney who tried defendant in New York that on May 21, 1997, defendant was convicted of second-degree murder in that state. The victim, Philip Rowe, was a twenty-four-year-old "friend" of defendant who suffered two gun-shot wounds to the head and one in his hand.

In support of the second aggravating factor, "murder in the course of a murder," the State presented evidence about the police discovery of the shootings; the processing of the apartment for forensic evidence; the general police investigation involving TJ, Emil, and defendant; and the results of ballistics examinations. The guilt-phase testimony of Emil and TJ was read to the jury. Investigator John Alloway, who had responded to the scene as a representative from the medical examiner's office, and Dr. Robert Catherman, who performed the autopsies, testified that the vic-

tims appeared to have been killed at or about the same time because their bodies were in the same state of decomposition.

The defense alleged as mitigating factors that defendant was under the influence of mental or emotional disturbance insufficient to constitute a defense to prosecution, *N.J.S.A.* 2C:11–3c(5)(a); defendant's age at the time of the murders, *N.J.S.A.* 2C:11–3c(5)(c); and thirteen circumstances of defendant's life under the "catch-all" mitigating factor, *N.J.S.A.* 2C:11–3c(5)(h). Numerous mitigation witnesses testified on behalf of defendant.

On April 6, 2000, the jury unanimously found both aggravating factors. The jury also found the *N.J.S.A.* 2C:11–3C(5)(a) mitigating factor (mental illness or emotional disturbance) (one juror) and eight of the *N.J.S.A.* 2C:11–3C(5)(h) (catch-all) factors: impairment of the bonding process between defendant and his mother (five jurors); defendant's lack of parental guidance from his mother (nine jurors); absence of defendant's father from his life (one juror); defendant's vulnerability to being used by others (eight jurors); defendant's relationship with his children and younger sister (three jurors); defendant's positive adjustment in prison (one juror); the precipitation of the murders by defendant's brother (two jurors); and defendant's notification to New York prison authorities about the New Jersey charges when his identity was unknown (nine jurors). Six mitigating factors were unanimously rejected: defendant's age; his witnessing of domestic violence; his family members' attitude about his dark skin color; blame for his brother's misdeeds; defendant's cooperation in his extradition to New Jersey; and any other factor relevant to his character or the offenses.

The jury concluded that the two aggravating factors outweighed the mitigating factors beyond a reasonable doubt. Judgments of two capital convictions and two death warrants were filed on the same date.

On May 25, 2000, the trial court denied a motion for a new trial. The court merged Count Seven (conspiracy to murder McLean) into Count One (capital murder of McLean), Count Eight (conspir-

acy to murder Mitchell) into Count Two (capital murder of Mitchell), and Count Ten (possession of a firearm for an unlawful purpose) into Counts One and Two. He sentenced defendant on the remaining non-capital convictions as follows: on Count Six (conspiracy to murder Emil Josephs) to a term of ten years to run consecutive to the other sentences and the sentence imposed in New York State; and on Count Eleven (unlawful possession of a handgun) to a term of five years to be served concurrently with the other sentences and the sentence imposed in New York State. The court also imposed an aggregate Violent Crimes Compensation Board penalty of $150 and an aggregate Safe Neighborhoods Services Fund assessment of $225. On May 3, 2000, defendant filed his Notice of Appeal to this Court.

## II.

### Asserted Guilt–Phase Errors

#### A. Failure to Prove Own–Conduct Murder

Defendant asserts a fundamental claim of error. He contends that the State failed to prove beyond a reasonable doubt that he murdered McLean and Mitchell by his own conduct, and therefore did not establish his eligibility for a capital sentence. Defendant points to the absence of direct evidence that any of the shots that killed either McLean or Mitchell were fired by defendant. The State's case relied exclusively on Emil's testimony, other evidence of a circumstantial nature retrieved at the scene of the shooting, and expert testimony.

After the jury reached its verdict in the guilt phase, defendant moved to dismiss his capital murder conviction. We note that the own-conduct issue was a matter of concern to the trial court and that defendant's motion required the trial court to assess the sufficiency of the proofs. Nonetheless, after hearing oral argument on the motion, the court concluded that "the circumstantial evidence presented by the State was sufficient to create a reasonable inference that defendant was present at the apartment,

possessed a weapon, and acted by his own conduct in causing the deaths of McLean and Mitchell." Under the circumstances, the court found that it was reasonable for the jury to infer that defendant, who had a motive to kill, acted as a second gunman. We agree with that determination.

■ A motion for judgment of acquittal is governed by *Rule* 3:18–1, which states:

> At the close of the State's case or after the evidence of all parties has been closed, the court shall, on defendant's motion or its own initiative, order the entry of a judgment of acquittal of one or more offenses charged in the indictment or accusation if the evidence is insufficient to warrant a conviction.
>
> [*Rule* 3:18–1.]

*State v. Reyes*, 50 *N.J.* 454, 236 *A.2d* 385 (1967), established that the general test to be applied when determining the sufficiency of evidence is

> whether, viewing the State's evidence in its entirety, be that evidence direct or circumstantial, and giving the State the benefit of all its favorable testimony as well as of the favorable inferences which reasonably could be drawn therefrom, a reasonable jury could find guilt of the charge beyond a reasonable doubt.
>
> [*Id.* at 459, 236 *A.2d* 385.]

The same standard or one substantially similar to that set forth in *Reyes* is common among the various states across the country. *See, e.g., State v. Fulminante*, 193 *Ariz.* 485, 975 *P.2d* 75, 82–84 (1999) (upholding capital conviction using similar standard after finding sufficient circumstantial evidence, taken as whole, to allow reasonable person to determine defendant's guilt beyond reasonable doubt); *People v. Kipp*, 26 *Cal.*4th 1100, 113 *Cal.Rptr.*2d 27, 50–51, 33 *P.*3d 450 (2001) (upholding capital conviction for first-degree murder in commission of robbery after finding sufficient evidence to support robbery conviction using similar standard); *People v. Williams*, 193 *Ill.*2d 1, 249 *Ill.Dec.* 840, 737 *N.E.*2d 230, 243–44 (2000) (applying similar standard in capital murder case to assess sufficiency of evidence), *cert. denied*, 532 *U.S.* 996, 121 *S.Ct.* 1657, 149 *L.Ed.*2d 640 (2001); *Commonwealth v. Hawkins*, 549 *Pa.* 352, 701 *A.2d* 492, 499–501 (1997) (employing same standard to find sufficient circumstantial evidence to conclude that defendant had requisite malice aforethought and specific intent to kill to

support capital conviction); *Remington v. Commonwealth*, 262 *Va.* 333, 551 *S.E.*2d 620, 624 (2001) (same), *cert. denied*, —— U.S. ——, 122 *S.Ct.* 1928, 152 *L.Ed.*2d 834 (2002); *State v. Davis*, 141 *Wash.*2d 798, 10 *P.*3d 977, 1021–23 (2000) (same).

The *Reyes* standard accords with the appellate standard for reviewing the sufficiency of evidence to support a criminal conviction that is set forth in *Jackson v. Virginia*, 443 *U.S.* 307, 99 *S.Ct.* 2781, 61 *L.Ed.*2d 560 (1979). Under that appellate standard of review, the relevant question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319, 99 *S.Ct.* at 2789, 61 *L.Ed.*2d at 573. *See also State v. Martinez*, 97 *N.J.* 567, 572, 483 *A.*2d 117 (1984) (following *Jackson v. Virginia* and holding that "the State's right to the benefit of reasonable inferences cannot be used to reduce the State's burden of establishing the essential elements of the offense charged beyond a reasonable doubt"). Thus, when reviewing a trial court's determination on a motion for acquittal, the appellate tribunal must "consider the State's proofs in light of the [*Reyes* ] standard and ... determine therefrom how the motion should have been decided." *State v. Gora*, 148 *N.J.Super.* 582, 596, 372 *A.*2d 1335 (App.Div.), *certif. denied*, 74 *N.J.* 275, 377 *A.*2d 679 (1977). The approach is the same whether the evidence is direct or circumstantial. *State v. Mayberry*, 52 *N.J.* 413, 437, 245 *A.*2d 481 (1968), *cert. denied*, 393 *U.S.* 1043, 89 *S.Ct.* 673, 21 *L.Ed.*2d 593 (1969); *State v. Franklin*, 52 *N.J.* 386, 406, 245 *A.*2d 356 (1968); *State v. Fiorello*, 36 *N.J.* 80, 87, 174 *A.*2d 900 (1961), *cert. denied*, 368 *U.S.* 967, 82 *S.Ct.* 439, 7 *L.Ed.*2d 396 (1962). *See also, State v. Taccetta*, 301 *N.J.Super.* 227, 241, 693 *A.*2d 1229 (App.Div.1997) (stating "[a]ppellate review is limited to the correction of injustice resulting from a plain and obvious failure of the jury to perform its duty" and citing *State v. Butler*, 32 *N.J.* 166, 195, 160 *A.*2d 8 (1960), *cert. denied*, 362 *U.S.* 984, 80 *S.Ct.* 1074, 4 *L.Ed.*2d 1019 (1960)). We therefore apply the *Reyes* standard to assess the sufficiency of the evidence to support

defendant's murder convictions and the jury determination that he committed the murders by his own conduct.

Defendant contests the reasonableness of a jury inferring from the evidence that he murdered McLean or Mitchell by his own conduct. According to defendant, the evidence "implicated Junior as the person who shot and killed McLean and Mitchell (as well as Christine Williams)," and only "pure speculation and conjecture" could lead to the conclusion that defendant took a direct and active role in the killings. There were no living witnesses to the murders. Only Emil saw someone attempt to fire a weapon, and that person was Junior, who shot at Emil with a nine millimeter handgun. Although the evidence established that defendant was still in the apartment and had been awake during the prior night talking with his brother, it is undisputed that at the time Emil jumped through the window to escape from Junior, defendant was neither in the room, nor were the other two guns, the .45 and the .357, in view. Therefore, defendant argues that an inference is required to conclude that defendant retrieved those weapons and used them to kill McLean and Mitchell after Emil fled. Other equal, or more plausible, inferences can be drawn, such as that Junior could have shot all three guns. Or, defendant may have assisted Junior only by retrieving the guns for Junior's use. The latter scenario would support a conviction for accomplice murder, but not murder by own conduct. Moreover, that McLean was assaulted with a steam iron could indicate that he was attacked by someone who was unarmed. Defendant argues that the injuries resulting from the attack with the iron were non-lethal, and that the perpetrator would not necessarily have caused McLean's death.

Defendant maintains that the State's contentions about own conduct are as speculative as any offered by the defense. Even assuming Emil testified truthfully, that would not preclude the possibility that Junior fired two of the weapons (including the nine millimeter with which he shot at Emil). It is undisputed that Junior shot all three victims, because all victims were struck with

nine millimeter bullets. Junior could have obtained all three guns prior to returning to the kitchen to kill Emil. Finally, in response to the State's theory that multiple shooters had to be involved because of the distinct locations of the victims, defendant notes the close proximity of the kitchen, where Junior shot at Emil, and the hallway and bathroom, where the bodies of Mitchell and Williams were found. If defendant had been armed only with a steam iron, he could have struggled with McLean in the bedroom at the far end of the hallway while Junior shot the others. After the others were killed, Junior then could have come to assist defendant with the struggling McLean.

The State responds that ample evidence supports the convictions. The State points to testimony from the trial establishing that: defendant was in the apartment at the time of the murders; defendant and Junior were the only individuals who left the apartment after the murders; a downstairs neighbor heard two men hurriedly leave the apartment, one of whom referred to the other using defendant's nickname, "Dee"; on the morning of the murders, the police chased a red Honda owned by defendant's mother; a black man fled from the vehicle before the chase began, and the driver was missing from the vehicle when the police found it moments later crashed into a fire hydrant; another neighbor described the two men who left the apartment as wearing leather hats, like the one found in the Honda, and said that the men were black, in their late twenties, and "just a little bit taller than she was"; Emil heard two different sounding guns being fired at or about the same time; McLean and Mitchell, who each engaged in struggles before their deaths, were shot multiple times with different weapons; Williams, on the other hand, was shot only two times through the head with a nine millimeter, and she was found crouched in a corner of the bathroom; Mitchell was found in the hallway on top of a shower curtain indicating that his struggle started in the bathroom but concluded with his being shot in the hallway.

The State disputes that the evidence supports a reasonable inference that Junior was the sole shooter. Defendant must have

taken a more active role, asserts the State, because multiple guns were heard firing and the murders occurred within a relatively short period of time in different parts of the apartment. It is implausible that Junior could have wielded three guns to kill the three victims in different parts of the apartment in the short period of time that the murders took place. Further, accepting the medical examiner's testimony that all of the gunshot wounds, as well as the blunt force injuries in the case of McLean, contributed to the victims' deaths, defendant could be found guilty of murder by his own conduct even if he was only responsible for some of the shots. Finally, in response to defendant's hypothesis that whoever beat McLean with the steam iron was unarmed, the State asserts that the jury apparently believed that defendant was armed because it convicted him of the murder of Mitchell, who was shot with two separate guns but was not beaten.

In addition, the State contends that the evidence presented at trial illuminated defendant's probable motives: greed and revenge for being told to leave the apartment and the lucrative drug-distribution operation. That revenge would cause defendant to become physically violent was demonstrated the night before the murder when McLean had to wrestle a kitchen knife from him. The greed motive, on the other hand, was supported by the fact that a bloody footprint was found in the attic where, according to Emil, he had stored $36,000.

The State's position on the sufficiency of the evidence is the better of the two. Of particular note is the forensic evidence. According to that testimony, which was not contradicted or impeached, Williams was killed by two nine millimeter gunshots to the head. Mitchell sustained four gunshot wounds: through the chest, the top of the forehead, the left cheek of his face, and the lower lip of his mouth. A projectile consistent with a nine millimeter bullet was found under Mitchell's torso. Two .45 caliber projectiles were found under his head. The lead core of a nine millimeter projectile was in his hair near an exit wound, and its jacketing was in the wound. Thus, two different guns were used in his death, the shots of both contributing to his death.

McLean sustained a total of six gunshot wounds: through the right forearm, the backs of each thigh, the left cheek of his face and the back right side of the head. A nine millimeter bullet entered through the back of the right thigh. The shot to the back right side of the head was from a .38 caliber bullet that was not from the same gun as the recovered nine millimeter or .45 caliber bullets. A .45 caliber bullet was recovered under the carpet under his lower abdomen and a nine millimeter bullet under his lower chest. A nine millimeter projectile was recovered from his abdominal area. The shots from each of the *three* different guns contributed to his cause of death.

Sergeant Burkhart, qualified as an expert in ballistics and firearms identification, established that all of the nine millimeter bullets had been fired from one gun, all the .45 caliber bullets had been fired from a second gun, and the .38 caliber bullet had been fired from a third gun, possibly a .357 revolver.

Emil's testimony identified Junior as having the nine millimeter when Emil fled the apartment. He immediately encountered neighbors and both Emil and his neighbors heard shots at different intervals being fired within the apartment. Although arguably Emil's testimony is self-serving, having been given in exchange for cooperation with the State, it was corroborated in significant ways by the testimony of what neighbors heard going on in the apartment after Emil had jumped from the kitchen window. Tussling and shots fired at different intervals were heard by various neighbors, and defendant's nickname was heard being uttered by one of two men leaving the apartment thereafter.

Moreover, the fact that Williams was shot only with a nine millimeter suggests that two shooters were involved in the deaths of McLean and Mitchell—each of whom was shot not only with a nine millimeter, but also with one or two other guns. McLean, who was found down the hall in the bedroom, was shot at with three types of guns and bludgeoned with a steam iron. His struggle indicated that more than one perpetrator was involved in

administering the shots from three guns and the blows from the iron. Similarly, Mitchell's struggle involved his movement into the hallway from the bathroom with the shower curtain and rod in tow before he was shot with two different guns: the nine millimeter and the .45. Only Williams, who was found crouched on the floor in a corner of the bathroom, was shot in the head twice with a single gun—the nine millimeter. From the angle and nature of her wounds, the jury reasonably could infer that she struggled the least and that would be consistent with the jury's finding that only one perpetrator was involved in her death. From the jury's acquittal of defendant of the Williams's murder, it is apparent that the jury regarded Junior as the shooter of the nine millimeter. The jury also could conclude that a second shooter was involved, namely defendant. Coupling that determination with the medical examiner's uncontradicted and unimpeached testimony that McLean and Mitchell died from the combination of their gunshot wounds and, in McLean's case also from the blunt force injuries to his head, the jury had ample basis reasonably to infer that defendant had committed own-conduct murder with respect to McLean and Mitchell.

We do not reweigh the evidence considered by the jury in our review. Appellate review serves to corroborate the absence of an injustice, taking care to ensure that the jury has not committed an obvious failure of duty. Mindful that we examine the sufficiency of the evidence by viewing it in its entirety and by giving the State the benefit of all reasonable inferences that can be drawn from the evidence in its favor, we conclude that the trial court did not err in denying defendant's motion for judgment of acquittal based on a failure of proof. Accordingly, we reject this first and most fundamental challenge to whether the jury could have found defendant guilty of own-conduct murder.

### B. Sequential Instruction to Jury on Own–Conduct Murder and Accomplice Liability

Defendant contends that the trial court erred in the sequential instructions to the jury on own-conduct murder and accomplice

liability, and its admonition to the jury to reach the accomplice-liability issue only if it first found that defendant had not committed own-conduct murder. He argues that the effect of the instructions precluded the jury from reaching a non-unanimous verdict on own-conduct murder that would have rendered defendant ineligible for the death penalty. Thus, defendant maintains that the sequential jury instructions improperly coerced the jury into reaching a death-eligible verdict.

After explaining the meaning of purposeful or knowing murder, the court instructed the jurors that if they found defendant guilty of murdering either Leon Mitchell or Barrington McLean, or both, they were then to consider whether he did so by his own conduct. The court explained

> The phrase by his own conduct means that Daron Josephs caused the death or serious bodily injury resulting in the death of the decedents in either of two ways. One, that Daron Josephs inflicted bullet wounds which caused the death or serious bodily injury resulting in the death of the decedents McLean and/or Mitchell or inflicted a combination of bullet wounds or blunt instrument blows to the head which caused the death or serious bodily injury resulting in the death of McLean. Or, two, that Daron Josephs along with Hugh Josephs inflicted bullet wounds upon Leon Mitchell or inflicted bullet wounds or combined bullet wounds and blunt force wounds upon the head of Barrington McLean which caused the death or serious bodily injury resulting in the death of one or more of the decedents. And when he did so it was Daron Josephs' purpose that the decedents or either of them should die or suffer serious bodily injury by his own conduct. Or he was aware that it was practically certain that his conduct would cause death or serious bodily injury. If you find that the death of the decedents or the serious bodily injury resulting in the death of the decedent was caused by a combination of wounds inflicted either by Daron Josephs and Hugh Josephs, Jr., acting in concert, and you further find that Daron Josephs when he inflicted those wounds had the purpose to kill or cause serious bodily injury or that he knew that the wounds he inflicted were practically certain to lead to death or serious bodily injury, then you may find Daron Josephs guilty of murder by his own conduct.

> The relevant inquiry is whether or not Daron Josephs actively and directly participated in the homicidal act; that is, in the infliction of the injuries from which the victims died or from which they suffered serious bodily injury resulting in death.

> If you find that Daron Josephs merely inflicted some minor injuries to the decedents and those wounds did not contribute in any substantial way to the death of the victims, then his acts could not be said to have caused the death of the decedents by his conduct.

The court then discussed the application of the concept of unanimity to own-conduct murder:

In this case there are a number of different legal routes by which you could arrive at a conviction. The routes chosen, if there is a conviction, depends on what you find the facts to be. Generally we ask a jury only if a defendant has been found guilty of a crime. We do not inquire if the jury considers the defendant who they convict to be what we call a principal or an accomplice or a co-conspirator. However, the practice is different when, as here, one of the charges is murder. If the jury convicts the defendant of murder in such a case, I then must ask if the jury unanimously and beyond a reasonable doubt finds two things. One, that the defendant committed a purposeful or knowing murder; and, two, that the defendant committed the fatal act by his own conduct . . . .

It is permissible for a jury to find a person guilty of a murder if some jurors see the person as the principal while others see him as an accomplice. What is essential is that each juror be satisfied in his or her own mind that all of the elements necessary to establish guilt under the theory upon which the individual juror convicts has been proven beyond a reasonable doubt.

A conviction of purposeful or knowing murder or any other kind of murder under these circumstances is perfectly proper. However, under our law a person is guilty of murder by his own conduct only if all 12 jurors find unanimously and beyond a reasonable doubt or both, one, that the defendant committed a purposeful and knowing murder; and, two, that he did so as a principal, not as an accomplice. And you'll be given a verdict sheet which is designed to capture that information. And if I might make a suggestion. You may find it convenient to first decide if all 12 jurors agree whether the defendant is guilty of murder. If the jury does so agree, then you should decide if the jurors individually and unanimously agree that it has been proven beyond a reasonable doubt that the defendant committed a purposeful or knowing murder as a principal; that is, by his own conduct. However, the order in which you consider these questions in your deliberations is entirely your own decision.

During a recess, counsel for defendant objected to the court's instructions on the ground that there was no evidence in the record to support a finding that defendant committed murder by his own conduct without the assistance of Junior. In addition, defendant contended that the court's charge on own-conduct murder was "premature" because the jurors had not been told the meaning of accomplice liability and so might presume that it applied to any "concerted action" between multiple defendants. Counsel requested that the court clarify for the jury that the "first issue before them . . . is to determine whether Daron Josephs is guilty of murder; whether it's by direct responsibility as a principal or as [an] accomplice and that it doesn't matter if they

unanimously agree on the theory to make that determination." Noting counsel's objection, the court stated that it would explain accomplice liability to the jury at a later point and that its charge would be clear when read as a whole.

Upon return from break, the court instructed the jurors that "whether Daron Josephs was a principal depends upon your answers to certain questions:"

Let's take Barrington McLean first. First, did Daron Josephs shoot or wound Barrington McLean with a blunt instrument? Two, if so, what did he have in mind when he shot and/or wounded Barrington McLean with this instrument? Three, did the wounds he inflicted contribute in some substantial way to the death of Barrington McLean or cause serious bodily injuries that resulted in his death? As to Leon Mitchell, ask yourselves, one, did Daron Josephs shoot Leon Mitchell? Two, if so, what did he have in mind when he shot Leon Mitchell? Three, did the wounds he inflicted contribute in any substantial way to Mr. Mitchell's death or cause serious bodily injuries that resulted in his death?

Now, if you're satisfied beyond a reasonable doubt that the answers to the first question as to any of the decedents is in the affirmative, you'll then address his state of mind when he did so. Was his purpose to kill or inflict serious bodily injury that resulted in death? Was he aware that his conduct was practically certain to cause death? You then ask the question if the wounds inflicted by Daron Josephs contributed in some substantial way to the death of the decedents. If Daron Josephs did inflict wounds which contributed to the death of the decedents in a substantial way, and he did so with the purpose to kill or to inflict serious bodily injuries resulting in death, or with knowledge that his conduct was practically certain to kill, he's guilty of a purposeful and knowing murder as a principal; that is, the acts would be by his own conduct.

The court then instructed the jurors that if they found that defendant injured the victims but did not do so purposefully or knowingly, it would then have to determine whether he committed aggravated manslaughter or manslaughter.

After the above instruction, the court charged the jury on accomplice liability:

Should you find that it has not been proven beyond a reasonable doubt that Daron Josephs inflicted the wound that caused the death of the decedents, then you shall consider if Daron Josephs should be held liable as an accomplice. Of course, I'm assuming that if you consider this question you would have found that Hugh Josephs inflicted the wounds that lead to the death of the decedents. If Daron Josephs is guilty as an accomplice of Hugh Josephs, Jr., then you face the question of what crime he had committed and this brings us to a discussion of the law regarding accomplices.

A person is guilty—strike that. A person is an accomplice in the commission of an offense if with the purpose of promoting or facilitating the commission of the crime he (a), solicits such other person to commit it; or (b), he aids or agrees or attempts to aid such other person in planning or committing the crime . . . .

In order to find Daron Josephs guilty of committing the crime of murder as an accomplice of Hugh Josephs, the following elements must be proven beyond a reasonable doubt. (a), that Hugh Josephs, Jr. committed the crime of murder. And (b), that Daron Josephs aided him in planning or committing the murder. Or agreed to aid or attempted to aid him in planning or committing the murder. Or solicited him to commit the murder. And (c), that Daron Josephs purpose was to promote or facilitate the commission of the offense. And (d), that Daron Josephs possessed the same criminal state of mind that's required to be proven against the person who actually committed the murder . . . .

If you find that Daron Josephs with the purpose of promoting or facilitating the commission of the crime of murder solicited Hugh Josephs, Jr. to commit murder or aided or agreed to aid or attempted to aid him in planning or committing murder, then you should find him guilty of murder as an accomplice and not by his own conduct.

Remember, if you find Daron Josephs guilty of murder as an accomplice, you cannot find him guilty of murder by his own conduct . . . .

Should you find that it has not been proven beyond a reasonable doubt that Daron Josephs inflicted the wound upon the decedents, but that Hugh Josephs, Jr. alone inflicted the wounds, you must consider whether Daron Josephs is guilty as an accomplice to murder. He would be deemed to be an accomplice if you find he aided Hugh Josephs, Jr. in committing the crimes and if, when he did so, he had the purpose to aid or assist Hugh Josephs, Jr. in the commission of a crime of murder.

Later, the court instructed the jury that if it found that the State failed to prove defendant inflicted the wounds that caused death, it still had to determine whether he was guilty as an accomplice. The court explained to the jury that it could find an accomplice guilty of a lesser degree of offense than was actually committed by the principal depending on the accomplice's state of mind. Finally, when discussing conspirator liability, the court repeated that "these questions only come up if you decide that the evidence does not establish beyond a reasonable doubt that Daron Josephs inflicted wounds which contributed in any substantial way to the death of the decedents."

Defense counsel again objected to that portion of the instructions that "suggested the order of deliberation by saying well, you won't have to consider this if you consider by your own conduct

first and only in the event you don't find that would you have to then worry about accomplice liability." Counsel argued that this was not a situation where it was "proper [for the court] to direct the order of deliberation." By telling the jurors the order in which to address the issues, counsel argued that the court

> implie[d] that you have this murder by your own conduct and then accomplice murder. And in terms of unanimity we know you can have [a] unanimous verdict of murder where some people believe it's accomplice and some people believe it's by your own conduct. And so it's not really necessary that they kind of conclude that it's not one thing before they consider it's another thing. It really suggests a manner of deliberation and unanimity that's not really appropriate.

Counsel requested the court to instruct the jurors that they can deliberate in any order they choose and can split on whether defendant committed murder by his own conduct or as an accomplice. Counsel also suggested that when handing out the verdict sheets the court could explain the jury's options in respect of own conduct and accomplice liability.

Following another break, the court instructed the jury that unanimity was required to convict defendant of all offenses except own-conduct murder, where a non-unanimous verdict was permissible. In reference to the verdict sheets, the court instructed the jurors that in respect of each victim they were to check off first whether defendant was guilty of murder and then check off whether they unanimously agreed that defendant committed murder by his own conduct. No mention was made of the possibility of accomplice liability.

In reviewing this claim of error, we begin with the requirement, fundamental to the assurance of a fair trial, that the trial court ensure that jury deliberations are based solely on the evidence and in accordance with proper and adequate jury instructions. *State v. Purnell*, 126 *N.J.* 518, 531, 601 *A*.2d 175 (1992). A trial court must "make absolutely certain the jury is aware, not simply of the consequences of its actions, but of its total responsibility for the judgment." *State v. Ramseur*, 106 *N.J.* 123, 316, 524 *A*.2d 188 (1987). In furtherance of the trial court's responsibility, it is not uncommon for the trial court to suggest an order of

deliberation as part of jury management. *State v. Zola*, 112 *N.J.* 384, 404–05, 548 *A.*2d 1022 (1988), *cert. denied*, 489 *U.S.* 1022, 109 *S.Ct.* 1146, 103 *L.Ed.*2d 205 (1989). To be sure, a sequential jury charge can perform a useful function. *State v. Coyle*, 119 *N.J.* 194, 223, 574 *A.*2d 951 (1990). Trial courts consistently instruct that a jury not consider lesser-included offenses until it first finds the defendant not guilty of the greater offense. *Ibid.* However, a sequential jury charge can be problematic when that charge encourages the jury to convict on the first, and most serious, charge because the jury believes the defendant is guilty of "some" crime. *United States v. Tsanas*, 572 *F.*2d 340, 345 (2d Cir.), *cert. denied*, 435 *U.S.* 995, 98 *S.Ct.* 1647, 56 *L.Ed.*2d 84 (1978).

Here, the presentation of the own-conduct murder charge and the accomplice-liability charge, and the relationship between the two, is of critical importance. *N.J.S.A.* 2C:11–3(c) renders death eligible those defendants who commit purposeful or knowing murder by their own conduct or who hire others to do the same. The own-conduct requirement is not an element of purposeful or knowing murder; it is the triggering device for the death penalty phase of the trial. *State v. Gerald*, 113 *N.J.* 40, 99, 549 *A.*2d 792 (1988). The jury must be satisfied unanimously and beyond a reasonable doubt that the defendant committed murder by his or her own conduct in order to proceed to the penalty phase. *State v. Brown*, 138 *N.J.* 481, 511, 651 *A.*2d 19 (1994). In contrast, even if the jury disagrees about whether the defendant committed murder by his own conduct or as an accomplice, it may still find the defendant guilty of murder. *Id.* at 527, 651 *A.*2d 19. The consequence of that disagreement is that the jury's decision will "constitute[ ] a final verdict that results in the imposition of a sentence of imprisonment." *Id.* at 511, 651 *A.*2d 19. Thus, because the principal and accomplice are equally guilty of purposeful or knowing murder under New Jersey's statutory scheme, accomplice-liability murder constitutes an alternative, not a lesser-included form of murder. *State v. Mejia*, 141 *N.J.* 475, 485, 662 *A.*2d 308 (1995).

■ *State v. Feaster*, 156 *N.J.* 1, 716 *A.2d* 395 (1998), *cert. denied*, 532 *U.S.* 932, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001), reaffirmed that "when a rational basis exists for a jury to convict a capital defendant of a non-death-eligible alternative form of homicide, a trial court should charge that offense in a manner that allows the jury to consider it simultaneously with death-eligible purposeful-or-knowing murder." *Id.* at 39, 716 *A.2d* 395. That requirement assures that the jury will properly consider "all" available options before rendering a death-eligible verdict, an important safeguard in light of the "qualitative differences between the death penalty and other penalties." *Ibid.* (quoting *Brown, supra*, 138 *N.J.* at 511, 651 *A.2d* 19). *Cf. State v. Cooper*, 151 *N.J.* 326, 369–70, 700 *A.2d* 306 (1997), *cert. denied*, 528 *U.S.* 1084, 120 *S.Ct.* 809, 145 *L.Ed.*2d 681 (2000) (upholding use of sequential charge in case involving capital murder and felony murder because offenses not mutually exclusive); *Mejia, supra*, 141 *N.J.* at 485, 662 *A.2d* 308 (concluding that trial court committed reversible error in giving sequential instructions on intent-to-kill murder and serious-bodily-injury murder because charge did not allow option of convicting defendant of purposeful or knowing murder without unanimously agreeing on defendant's mental state); *Coyle, supra*, 119 *N.J.* at 222–23, 574 *A.2d* 951 (finding harmful error in trial court's sequential charge on purposeful murder and passion/provocation manslaughter, reasoning that sequential charge "had the potential to foreclose jury consideration of whether passion/provocation should reduce an otherwise purposeful killing from murder to manslaughter").

■ As the Court in *Feaster* explained:

In capital cases that present a jury question whether a defendant is guilty of death-eligible own-conduct murder or accomplice-liability murder, the trial court, after instructing the jury on the requisite elements of the charged offenses, should instruct the jury first to determine whether the defendant is guilty of purposeful-or-knowing murder. *See Gerald, supra*, 113 *N.J.* at 100, 549 *A.2d* 792. The jury should be instructed that only if it unanimously reaches a guilty verdict on that offense should it then determine whether the defendant committed the murder "by his own conduct" or, alternatively, as an accomplice, the charge emphasizing that because those alternatives are mutually exclusive the jury should consider them

simultaneously. During the course of its instructions, the court should make clear to the jury that it need not be unanimous on the own-conduct determination, and it must inform the jury of the legal consequences of its own-conduct finding.

[*Feaster, supra,* 156 *N.J.* at 42, 716 *A.*2d 395.]

The jury's initial determination of guilt or innocence on the charge of purposeful or knowing murder is not intended "to resolve whether the defendant acted as principal or accomplice." *Ibid.* Instead, "[o]nly subsequent to a guilty verdict of purposeful-or-knowing murder will the jury specifically consider what form of murder—accomplice-liability or own-conduct—supports the murder conviction." *Id.* at 42–43, 716 *A.*2d 395. Applying that holding to the facts before it, the Court concluded that the trial court erred by instructing the jury to consider accomplice liability after it rejected own-conduct murder. *Id.* at 40–41, 716 *A.*2d 395. The Court stated:

[T]he instructions improperly focused the jury's attention on the State's theory of the case and "had the potential to foreclose jury consideration," *Coyle, supra,* 119 *N.J.* at 222, 574 *A.*2d 951, of the non-death-eligible alternative. Moreover, the sequential instructions, standing alone, effectively required the jury to reject own-conduct murder in order to reach accomplice liability. That framework contravened our holding in *Brown, supra,* 138 *N.J.* at 509–22, 651 *A.*2d 19, that the own-conduct determination may be nonunanimous, in which event the penalty phase would be avoided.

[*Id.* at 40, 716 *A.*2d 395.]

Ultimately, it was determined that the error was harmless for two reasons. *Ibid.* First, counsel failed to object at trial, indicating "a trial strategy aimed at avoiding a compromise verdict and securing a complete acquittal for defendant." *Id.* at 41, 716 *A.*2d 395. Second, because the victim died as a result of a single shotgun wound, the facts rendered resolution of the own-conduct question essentially equivalent to rejection of an accomplice liability theory. *Id.* at 40, 716 *A.*2d 395.

The prejudicial capacity of a sequential charge depends always on the " 'circumstances of the case.' " *Mejia, supra,* 141 *N.J.* at 484, 662 *A.*2d 308 (quoting *Zola, supra,* 112 *N.J.* at 406, 548 *A.*2d 1022). Here, unlike in *Feaster,* defendant objected to the sequential jury instructions. Therefore, the applicable

standard of review is whether the alleged defective jury charge constitutes harmless error.

Because the charge placed such emphasis upon the determination of own-conduct murder, including the repeated references to deciding own conduct responsibility before deciding accomplice liability, it is improbable that the jury understood that it could decide those issues in whatever order it saw fit. Unlike the situation in *Feaster*, the sequential instructions in this case were highly likely to have affected the jury's deliberations. As noted earlier, Feaster did not have a co-defendant and he admitted to being the triggerman, so accomplice liability was not a feasible theory in that case.

Here, there were two defendants and three guns. Accomplice liability was a very viable theory for defendant. If the jury followed the suggestions of the trial court, however, it might not have even considered accomplice liability until after it decided on own-conduct murder. That risk creates an unmitigated flaw in the reliability of the jury's verdict.

If defendant is to be found guilty of purposeful or knowing murder by his own conduct, we must have confidence that the jury understood the availability of an accomplice-liability theory, and instead unanimously chose the own-conduct theory. We have no reason to be confident of that here, either from the charge to the jury, considered in its totality, or from the facts of the case, as in *Feaster*. Indeed, as the discussion of the prior issue reveals, although the jury reasonably could infer from the evidence and testimony that defendant engaged in murder by his own conduct, it also would have been possible for the jury to fail to find unanimously that defendant committed the murders by his own conduct—and not as an accomplice.

Thus, it was critically important for the jury to have understood its options as it deliberated through the various choices it had to make with regard to defendant's role in the deaths of McLean and Mitchell. Of equal importance is that on review we can be confident that defendant was found unanimously guilty of own-

conduct murder by a jury that knew it was rejecting an alternative choice—that he was an accomplice. The proofs of this case could support the conclusion that the various gun shot wounds inflicted by the .45 and .357 guns, as well as the blunt force head injuries to McLean indicated purposeful and knowing murder, and that defendant inflicted some or all of them by his own conduct in respect of the victims McLean and Mitchell. However, we have no assurance that that jury determination was made by the jury with the knowledge that it was rejecting accomplice liability for defendant when it made that finding.

On the determination of own-conduct murder hinged defendant's death eligibility. By no means can an error in the determination of own-conduct murder on these facts be deemed inconsequential. We conclude that this error in the sequential instructions to the jury on own-conduct murder and accomplice liability constitutes error that is not harmless, and that it requires reversal of the jury determination of death eligibility. *Brown, supra,* 138 *N.J.* at 526–27, 651 *A.*2d 19. The erroneous instruction does not affect defendant's murder convictions, however, because the jury could have convicted him of the murders notwithstanding a disagreement about whether he committed them by his own conduct or as an accomplice. *Id.* at 527, 651 *A.*2d 19.

### C. Other Alleged Guilt–Phase Instruction Errors

Although we are reversing defendant's death sentence on the basis of the sequential instruction error, we review nonetheless defendant's other contentions of error. With regard to his guilt trial, defendant's remaining contentions concern aspects of the instructions to the jury.

#### 1. Instruction on Serious–Bodily–Injury Murder

Defendant asserts that the court erred by instructing the jury that it could find him guilty of murdering McLean by his own conduct even if he was responsible only for inflicting the blunt force injuries. According to defendant, the medical examiner's testimony was insufficient to prove that blunt force injuries were a

"direct and immediate cause of death." Defendant further contends that the trial court erred by charging the jury that it could find him guilty of serious-bodily-injury murder if he intended to injure McLean seriously, but was unaware that the injuries were likely to result in death, contrary to the holding in *State v. Cruz,* 163 *N.J.* 403, 417–18, 749 *A.*2d 832 (2000).

To address this issue, we turn first, as we must, to the controlling statute. *N.J.S.A.* 2C:11–3c provides, in pertinent part, that "[a]ny person convicted under [*N.J.S.A.* 2C:11–3a(1) or (2) ] *who committed the homicidal act by his own conduct;* or who as an accomplice procured the commission of the offense by payment or promise of payment of anything of pecuniary value ... shall be sentenced" in accordance with the Act's capital punishment provisions. *N.J.S.A.* 2C:11–3c (emphasis added). In *Gerald, supra,* 113 *N.J.* at 96, 549 *A.*2d 792, we considered the meaning of the "own conduct" provision of *N.J.S.A.* 2C:11–3c. There, the victim's death was caused by blunt-force injuries to the head, inflicted by blows of the fists and feet from multiple persons. *Id.* at 50, 549 *A.*2d 792. Because the expert testifying was unable to isolate who administered the fatal blows, the defendant argued that he was not death eligible. *Id.* at 92–93, 549 *A.*2d 792. That argument was rejected, the Court holding that to find a defendant guilty of own-conduct murder, the pertinent jury determination must be that "the defendant *actively and directly participated in the homicidal act,* that is, in the infliction of injuries from which the victim died." *Id.* at 97, 549 *A.*2d 792.

In this case, we are satisfied that the court properly instructed the jury that it could find defendant guilty of murdering McLean by his own conduct even if he was responsible only for inflicting the blunt–force injuries. Dr. Catherman testified that, "to some extent, although small," the four blunt–force injuries to McLean's head contributed to his death in combination with the six gunshot wounds. Undoubtedly, that testimony did not prove that the blunt–force injuries were the exclusive, or even the primary, cause of McLean's death. However, all that was necessary was that the

testimony establish that defendant "actively and directly partici-
pated in the homicidal act." *Id.* at 97, 549 *A.2d* 792. Given Dr.
Catherman's testimony, there is no doubt that a reasonable jury
could have concluded, beyond a reasonable doubt, that McLean
died from a combination of injuries, including blunt–force trauma.
Because it was appropriate for the trial court to refer to the
blunt–force injuries in addition to the gunshot wounds in the "own
conduct" charge, we find no error in that aspect of the court's
charge.

In any event, any error here was harmless. Because defendant
also was found guilty of murdering Mitchell, who suffered only
from gunshot wounds, the jury must have concluded that defen-
dant possessed a gun. Moreover, Mitchell was shot with the .45
caliber gun and the nine millimeter gun; because Emil testified
that Junior shot at him with the latter weapon, the jury must have
found that defendant used the former. Not coincidentally, Mc-
Lean also was shot with the .45 caliber gun. It is logical, then,
that the jury concluded that defendant shot McLean with the .45
caliber gun.

Defendant further contends that the trial court com-
mitted error by charging the jury that it could find him guilty of
serious-bodily-injury murder if he intended to seriously injure
McLean, but was unaware that the injuries were likely to result in
death, in contravention of our holding in *Cruz, supra,* 163 *N.J.* at
417–18, 749 *A.2d* 832. Because defendant failed to raise an
objection to the charge at the time the charge was given, we
review defendant's claim under the plain error standard. *State v.
Hock,* 54 *N.J.* 526, 538, 257 *A.2d* 699 (1969), *cert. denied,* 399 *U.S.*
930, 90 *S.Ct.* 2254, 26 *L.Ed.2d* 797 (1970) (stating that jury charge
will qualify as plain error if there is "legal impropriety in the
charge prejudicially affecting the substantial rights of the defen-
dant and sufficiently grievous to justify notice by the reviewing
court and to convince the court that of itself the error possessed a
clear capacity to bring about an unjust result").

At the close of the guilt phase, the trial court instructed that there are "several different types of conduct which constitute murder," including purposeful and knowing murder and serious-bodily-injury murder. To convict defendant of purposeful and knowing murder, the jury had to find that defendant acted with the purpose of causing death or with the knowledge that it was practically certain that death would occur; and that his actions caused the death of one or more victims. To convict of serious-bodily-injury murder, the jury had to find that defendant purposefully or knowingly inflicted injuries on one or more of the victims, "but, nevertheless, the injuries caused the death of the [victim or victims];" and the injuries were serious. The court defined "serious bodily injury" as "bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss or impairment of the function of any part of the body."

Concerning the applicable mental states, the court stated that "[a] person who causes another's death does so purposely when it is the person's conscious object to cause death," and that "[a] person who causes another's death does so knowingly when the person is aware that it is practically certain that his conduct will cause death." With respect to murder by one's own conduct, the jury was instructed that it had to find that defendant, acting with the requisite mental state, inflicted the bullet wounds and/or the blunt instrument wounds that caused the death or serious bodily injury resulting in the death of McLean or committed the same along with Junior. If the jury found only that defendant "inflicted some minor injuries to the decedents and those wounds did not contribute in any substantial way to the death of the victims," then it could not convict him of murder by his own conduct because he did not cause the death of the victims.

Again, we turn to the statutory language. "Serious bodily injury" is defined as "bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily mem-

ber or organ." *N.J.S.A.* 2C:11–1b. *State v. Simon,* 161 *N.J.* 416, 737 *A.*2d 1 (1999), held that to convict a defendant of serious-bodily-injury murder, the State must prove that the defendant "purposely or knowingly caused an injury from which death is practically certain to ensue." *Id.* at 449, 737 *A.*2d 1. The issue was revisited in *Cruz,* in which we held that to convict a defendant of purposeful serious-bodily-injury murder, the State "must prove that it was the defendant's conscious object to cause serious bodily injury that then resulted in the victim's death, [and] knew that the injury created a substantial risk of death and that it was highly probable that death would result." *Supra,* 163 *N.J.* at 417–18, 749 *A.*2d 832.

Here, the court charged the jurors on purposeful or knowing infliction of serious bodily injury, but failed to instruct them that they must find that defendant had knowledge that the injury created a substantial risk of death. Although the trial court did not specifically instruct the jurors that they could not convict defendant of serious-bodily-injury murder unless they found that defendant knew the injury created a substantial risk of death, and knew it was highly probable that death would result, we find that the court's instructions, considered as a whole, achieved the same result. The trial court did define "serious bodily injury" as "bodily injury which creates a substantial risk of death."

Further, there is no reasonable likelihood that defendant was prejudiced by the alleged deficiency in the serious-bodily-injury instructions. As noted earlier, logic dictates that the jury convicted defendant of the murders of both McLean and Mitchell because it found that he was the shooter of the .45 caliber gun. Consistent with this Court's prior decisions, the jury was instructed that if it found that defendant used a deadly weapon such as a firearm in committing the murders, it could draw an inference that he had the intent to kill. *See generally State v. Martini,* 131 *N.J.* 176, 269–72, 619 *A.*2d 1208 (1993), *cert. denied,* 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995) (approving of that instruction); *Simon, supra,* 161 *N.J.* at 450, 737 *A.*2d 1 (noting that "common

sense informs us that when someone shoots at another person ·in the upper body region, such as the neck and head, the shooter's purpose is either to cause serious bodily injury that results in death or to actually cause death, especially where no other plausible explanation is given"). Such an inference is clearly permissible here where it was found that McLean was not only beaten on the head with a blunt instrument, but also shot six times, twice in the head, and that Mitchell was shot four times, including three times in the head and once in the chest, by different guns including the .45. The wounds demonstrate a purposeful and knowing intent to cause death. Therefore, there is very little risk that the jury would have found that he intended only to cause serious bodily injury and not death. Because any technical failing in the jury instruction does not convince us that it had the capacity to bring about an unjust result, we hold that the error in the serious-bodily-injury instructions · does not constitute plain error.

### 2. Additional Asserted Instruction Errors

Defendant's final contentions concern the denial of his request for a charge on self-defense, defense of others, and the lesser-included offense of passion/provocation manslaughter. The trial court declined to give those charges because they were unsupported in the record.

### a. Self–Defense/Defense of Others

The use of force against another in self-defense is justified "when the actor reasonably believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." *N.J.S.A.* 2C:3–4a. Self-defense requires an actual, honest, and reasonable belief by the defendant of the necessity of using force. *State v. Kelly,* 97 *N.J.* 178, 198–99, 478 *A.*2d 364 (1984). The reasonableness of the defendant's belief is determined by the jury, using an objective standard of what a reasonable person in the defendant's position would have done at the time the force was used. *Id.* at 199–200, 478 *A.*2d 364. The jury is not required to find beyond a reasonable doubt that the

defendant's belief was honest and reasonable. *Id.* at 200, 478 *A.*2d 364. Rather, "if any evidence raising the issue of self-defense is adduced, either in the State's or the defendant's case, then the jury must be instructed that the State is required to prove beyond a reasonable doubt that the self-defense claim does not accord with the facts." *Ibid.*

For a defense of others charge, it must be shown that "the use of force upon or toward the person of another is justifiable to protect a third person when ... [t]he actor would be justified under section 2C:3–4 in using such force to protect himself against the injury he believes to be threatened to the person whom he seeks to protect." *N.J.S.A.* 2C:3–5a(1). The defense is applicable if the defendant reasonably believed "that the person he sought to aid was unlawfully attacked and that the force used was necessary to protect the person from the attack." *State v. Bryant,* 288 *N.J.Super.* 27, 35, 671 *A.*2d 1058 (App.Div.), *certif. denied,* 144 *N.J.* 589, 677 *A.*2d 761 (1996). Similar to the self-defense doctrine, the trial court is required to instruct on defense of another if there is a rational basis in the record to support it. *State v. Doss,* 310 *N.J.Super.* 450, 458–60, 708 *A.*2d 1219 (App. Div.), *certif. denied,* 155 *N.J.* 589, 715 *A.*2d 992 (1998).

To support his claim to the charges, defendant cites to several parts of the record: Emil's testimony that tensions had been mounting in the apartment; the testimony of Fonceta Young and Joyce Poole, the two neighbors who heard "thumping" noises and who thought that "some guys" in the apartment were "wrestling," "playing around," or fighting before the shootings occurred; and the fact that McLean had been beaten with a steam iron before he was shot as indicating that McLean either threatened or attacked defendant causing defendant to pick up the iron and use it in self-defense.

Defendant's recitation of the evidence would require a jury to make several inferences: that the sounds heard by the neighbors were fights, that one of the victims was the aggressor, that defendant was provoked into attacking the victim, and finally that

deadly force was necessary to protect defendant or another person. Defendant failed to point to any facts that provide a rational basis from which a jury could reasonably infer that he acted in self-defense or in defense of another. The trial court did not err by declining those charges.

### b. Passion/Provocation

Defendant's contention concerning the trial court's denial of a passion/provocation manslaughter charge suffers from similar infirmities. Murder is reduced to manslaughter if the murder is committed in the heat of passion in response to a reasonable provocation. *N.J.S.A.* 2C:11–4b(2). Passion/provocation manslaughter has four elements: (1) reasonable and adequate provocation; (2) no cooling-off time in the period between the provocation and the slaying; (3) a defendant who actually was impassioned by the provocation; and (4) a defendant who did not cool off before the slaying. *State v. Mauricio,* 117 *N.J.* 402, 411, 568 *A.*2d 879 (1990). The first two elements of the offense are objective; thus, if they are supported by the evidence, the trial court should instruct the jury on passion/provocation manslaughter, leaving the determination of the remaining elements to the jury. *State v. Robinson,* 136 *N.J.* 476, 491, 643 *A.*2d 591 (1994).

In support of the passion/provocation manslaughter claim, defendant theorizes that based on the neighbors' testimony of possible wrestling or fighting before the shootings, a fight broke out between defendant and Junior and the victims after Junior attempted to shoot Emil. Under that version of events, defendant claims he had little time to cool off as a result of the provocation. Further, defendant submits that Emil, McLean, or Mitchell may have threatened defendant with a weapon, which also would have added to the adequacy of the provocation.

Although mutual combat may constitute adequate provocation, *State v. Crisantos,* 102 *N.J.* 265, 274, 508 *A.*2d 167 (1986), defendant's suggestions of "mutual" combat are nothing more than rank speculation and are unsupported by the record. We find no basis on which to overturn the trial court's refusal to give a

passion/provocation manslaughter charge that lacked a rational basis in the record.

### D. Guilt–Phase *Voir Dire* Inadequacy

 Finally, we note that defendant argues that the jury *voir dire* for the guilt-phase proceedings was inadequate in several respects. Specifically, defendant maintains that the trial court erred by failing to ask prospective jurors whether they would accept the principles of presumption of innocence and reasonable doubt. Defendant argues that such inquiries are essential to determine whether the prospective jurors would hold the State to its burden of proof during deliberations.

 Jury fairness and impartiality takes on added significance in capital cases. *State v. Williams*, 93 *N.J.* 39, 61, 459 *A.*2d 641 (1983) (*Williams I*). We have emphasized the importance of the *voir dire* examination of prospective jurors to reveal potential and latent biases. *State v. Williams*, 113 *N.J.* 393, 409–10, 550 *A.*2d 1172 (1988) (*Williams II*). However, trial courts are allowed broad discretion to assess the qualification of jurors, the exercise of which "will ordinarily not be disturbed on appeal." *State v. Jackson*, 43 *N.J.* 148, 160, 203 *A.*2d 1 (1964), *cert. denied*, 379 *U.S.* 982, 85 *S.Ct.* 690, 13 *L.Ed.*2d 572 (1965); *Ramseur, supra*, 106 *N.J.* at 256–57, 524 *A.*2d 188 ("Of necessity, a sound measure of discretion must be reposed in our trial courts to determine whether a given juror can well and truly discharge the grave responsibility entrusted.").

Two of defendant's proposed questions were rejected by the trial court. The first pertained to the prospective juror's ability to presume defendant's innocence despite the fact that defendant had been charged with three murders. The second question focused on the juror's ability to hold the prosecution to its burden of proof even if the juror personally believed that defendant was guilty. The trial court declined to present those questions because presumption of innocence and burden of proof would be adequately addressed in the court's jury instructions and in the court's

general *voir dire* question: whether the jurors could follow the law as charged. Nevertheless, the trial court did agree to ask the jurors whether they could set aside any personal feelings in a case involving three murders.

The trial court instructed the assembled prospective jurors and the jury selected on the presumption of innocence and the burden of proof. The court also probed each juror concerning whether he or she would have difficulty setting aside personal feelings in a case involving three murders. When one prospective juror indicated that he would hold it against defendant if he elected not to testify, the court asked whether he could not set aside that bias in light of the court's instructions on the defendant's right not to testify and the State's burden of proof beyond a reasonable doubt. When the juror responded that he would hold defendant's failure not to testify against defendant "if it was close," the court promptly excused the juror.

Based on an examination of the record, we find no abuse of discretion in the trial court's rejection of defendant's request to question individually prospective guilt-phase jurors on their willingness to accept the presumption of innocence and the State's burden of proving guilt beyond reasonable doubt. Although we encourage trial courts to be "sensitive to permitting attorneys to conduct some *voir dire*," *State v. Biegenwald,* 106 *N.J.* 13, 30, 524 *A.*2d 130 (1987), we note here that the trial court adopted the majority of the *voir dire* questions submitted by defendant. The decision to omit two of eight questions was well within the trial court's discretion. Further, the instructions to the prospective jurors and the deliberating jurors were sufficient to ensure that the jury was impartial and could follow the law as charged.

III.

Penalty–Phase Errors

Defendant asserts error in the selection of the penalty-phase jury, in the conduct of the penalty trial, in the jury charge during

this phase of the proceeding, and in the jury's assessment of the aggravating factors. Notwithstanding our finding of error in the own-conduct instruction during the guilt-phase, defendant's contentions are reviewed to provide guidance on the issues raised in the event the State elects to pursue the death penalty on remand.

### A. Penalty–Phase Jury Selection

#### 1. Reference to Appellate Process

Defendant contends that the prosecutor improperly diminished Juror Robert Bighan's sense of responsibility as a penalty-phase juror by providing assurance that the jury's verdict would be reviewed on appeal. The prosecutor explained to Bighan that the appellate process would be long and thorough, and asked him directly whether that information comforted him. Defendant disputes the State's assertion that the prosecutor's comments were invited by the juror's comments on the State of Illinois' death sentence moratorium and concern about the risk of executing innocent people. According to defendant, the juror merely expressed a general concern about the death penalty that was unworthy of the highly specific response given by the prosecutor. Further, defendant contends that the trial court's curative instruction increased the risk of prejudice. Instead of simply ordering the juror to disregard the prosecutor's remarks, the trial court told the jury that what was said about the appellate process was "absolutely correct."

In *Williams II*, this Court emphasized the need for a "thorough and searching inquiry" into the jurors' attitudes on the death penalty. 113 *N.J.* at 413, 550 *A.*2d 1172. That inquiry is necessary given the "important, delicate, and complex nature of the death qualification process." *Ibid.* This Court also observed in *Ramseur* that trial courts must be accorded "a sound measure of discretion" in determining whether a juror's death penalty views would prevent or substantially interfere with the juror's performance of his or her duties. *Supra*, 106 *N.J.* at 256, 524 *A.*2d 188. However, as part of that delicate interaction with

jurors, a trial court must be aware that "any instruction that 'tend[s] to dilute the jury's sense of responsibility in passing on the issue of life or death' is erroneous." *Id.* at 316, 524 *A.*2d 188 (quoting *State v. Mount*, 30 *N.J.* 195, 214, 152 *A.*2d 343 (1959) (holding that because juries bear sole "responsibility in passing on the issue of life or death," juries are obligated to confront that issue without consideration of the possibility of appeal)).

The United States Supreme Court in *Caldwell v. Mississippi*, considered the validity of a capital sentence after the prosecutor urged the jury to refrain from viewing its role as determining whether the defendant would die because the state Supreme Court would review the correctness of the death sentence. 472 *U.S.* 320, 323, 105 *S.Ct.* 2633, 2635, 86 *L.Ed.*2d 231, 235–36 (1985). The Court overturned the death sentence, stating that "[b]ecause we cannot say that [the State's effort to minimize the jury's sense of responsibility for determining the appropriateness of death] had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires." *Id.* at 341, 105 *S.Ct.* at 2646, 86 *L.Ed.*2d at 247.

The holding in *Caldwell* was refined later to prohibit only those remarks "that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright*, 477 *U.S.* 168, 183 n. 15, 106 *S.Ct.* 2464, 2472 n. 15, 91 *L.Ed.*2d 144, 158–59 n. 15 (1986); *see also Romano v. Oklahoma*, 512 *U.S.* 1, 8, 114 *S.Ct.* 2004, 2009, 129 *L.Ed.*2d 1, 11 (1994) (noting Justice O'Connor's concurring opinion in *Caldwell* narrowing scope of holding); *State v. Koskovich*, 168 *N.J.* 448, 536, 776 *A.*2d 144 (2001) (stating that "[l]ike the United States Supreme Court, we also assume that capital-sentencing jurors recognize the gravity and significance of their responsibility"). Thus, to establish a *Caldwell* violation, the defendant has the burden of showing that the remarks to the jury on the death penalty improperly described the role assigned to them under state law. *Dugger v. Adams*, 489 *U.S.* 401, 407, 109 *S.Ct.* 1211, 1215, 103 *L.Ed.*2d 435, 443 (1989).

The prejudice that results from a *Caldwell* error was recognized in *State v. Rose*, 112 *N.J.* 454, 548 *A.*2d 1058 (1988). In *Rose*, the prosecutor, in the course of his opening statement in the penalty phase, informed the jury that the law, not the jurors, would be responsible for the defendant's execution. *Id.* at 510, 548 *A.*2d 1058. Citing to *Caldwell, Ramseur,* and *Mount,* this Court held that the prosecutor's remarks to the jury were knowingly misleading in the sense that they tended to dilute the jury's sense of responsibility in passing on the issue of life or death. *Id.* at 514, 548 *A.*2d 1058. *See also State v. Bey*, 112 *N.J.* 123, 164, 548 *A.*2d 887 (1988) (*Bey II* ) (finding reversible error where court's penalty-phase "charge failed to communicate that the jury, not the mechanics of the statute or the 'law,' is ultimately responsible for the imposition of the death penalty"); *Flamer v. Delaware,* 68 *F.*3d 710, 735 (3d Cir.1995) (holding that principle in *Caldwell* was not violated when trial court instructed the jury that its sentencing recommendation was binding "if supported by the evidence"), *cert. denied,* 516 *U.S.* 1088, 116 *S.Ct.* 807, 133 *L.Ed.*2d 754 (1996).

The responsibility borne by a sentencing jury is grave and the jury's perception of its signal responsibility to determine whether to impose the death penalty cannot be lightened. It is the difficult judgment that each juror must face. No dilution of the jury's singular role can be allowed to dull an individual juror's comprehension of that responsibility. Our review of the record in this matter persuades us that the prosecutor's statement did tend to minimize Bighan's sense of responsibility. For the prosecutor to have suggested that the appellate process would take care of Bighan's concern about "the execution of innocents" was improper and had the capacity to mislead. It could have left Bighan with a lessened sense of responsibility for his role as a juror because it. assured him that a "higher" authority would act as a check on the correctness of a jury verdict of death. That was an impermissible suggestion for the prosecutor to convey. The risk that Bighan would take that misapprehension with him into deliberations was not ameliorated when the court informed him that the prosecutor's comments were "absolutely correct."

Trial courts must act to rectify any juror's misapprehension concerning his or her role in passing on a sentence of life versus death, and must be vigilant in identifying any misunderstandings that may result from suggestive remarks by counsel. The totality of the judge's interaction with and instructions to the jury may have ameliorated the possibility that this exchange with Juror Bighan was reversible error. We need not resolve that question in view of our earlier disposition. However, we urge trial courts to take vigorous and prompt measures to prevent the possibility of that type of suggestiveness in the future.

2. Excusal of Juror Based on Views on Death Penalty

Defendant contends that the trial court erred in excusing for cause penalty-phase juror Rebecca Pierson because she could not say explicitly whether she would be willing to vote to impose the death penalty.

The test for determining when it is proper to excuse a prospective juror for cause based on the juror's death penalty views is the same under the New Jersey Constitution as it is under the United States Constitution: a juror may not be excused for cause based on his or her views on capital punishment " 'unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Ramseur, supra,* 106 *N.J.* at 255, 524 *A.*2d 188 (quoting *Adams v. Texas,* 448 *U.S.* 38, 45, 100 *S.Ct.* 2521, 2523, 65 *L.Ed.*2d 581, 589 (1980)). While the "standard does not require that a juror's bias be proven with unmistakable clarity," it also does not require a "conscientious juror to state with the same clarity a willingness to convict in a case that has not yet been heard." *Ramseur, supra,* 106 *N.J.* at 256–57, 524 *A.*2d 188. Thus, the trial court must conduct a sensitive appraisal of the juror's beliefs and opinions to determine if they would substantially interfere with the juror's performance of his or her duties.

Here, Juror Pierson vacillated concerning her ability to impose the death penalty. Although not philosophically or religiously opposed to the death penalty, she equivocated concerning her

ability to impose the death penalty "when . . . faced with a human being." In response to numerous questions concerning her ability to impose the death penalty, Juror Pierson framed her responses to indicate that she would not be able to give a definitive response until she were required to vote and had heard the facts regarding the aggravating and mitigating factors in detail. Notably, when asked whether she would return a verdict for a life sentence if she found that the mitigating factors were outweighed by the aggravating factors, and if she were the deciding vote, she replied: "I don't know." The trial court concluded, after extensive probing, that there was no way of knowing whether Juror Pierson would be "capable of imposing the death penalty if the facts and circumstances warranted it." The court determined that she was too equivocal in her responses, even when informed that if the aggravating factors outweighed the mitigating factors the law required imposition of the death sentence.

We are fully satisfied that the trial court did not abuse its discretion in excusing Juror Pierson. The trial court conducted a thorough and thoughtful *voir dire* examination of Juror Pierson's ability to perform the function as a penalty-phase juror in a capital murder trial. After reviewing the record and the extensive probing conducted by the trial court into Juror Pierson's beliefs and opinions, we are satisfied that Juror Pierson's honest and profound uncertainty concerning her ability to vote for the death penalty, even if the aggravating factors outweighed the mitigating factors, rendered her unable to serve as a capital juror. Therefore, the trial court's dismissal of Juror Pierson constituted an appropriate exercise of its discretion.

## B. Conduct of Penalty–Phase Trial

### 1. Failure to Prove Aggravating Factor 4(g)

Defendant contends that the trial court erred in instructing the penalty-phase jury that it was required to accept the murder verdicts of the guilt-phase jury in its deliberations on the 4(g)—murder in the course of murder—aggravating factor. In support, defendant cites to the death penalty statute, which states that

evidence presented at trial that is relevant to the aggravating and mitigating factors need not be reintroduced at the penalty phase if the factfinder is the same at both stages. *N.J.S.A.* 2C:11–3c(2)(c). Defendant maintains that the implication of that provision is that evidence from the guilt phase must be reintroduced at the penalty phase if, as was the case here, the factfinder is different.

 To impose the death penalty, the jury must find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. *Bey II, supra,* 112 *N.J.* at 158–59, 548 *A.*2d 887. This Court has declared that a trial is constitutionally defective if "the State is not required to prove, over the defendant's objection, the essential elements of the offense charged. The requirement is so basic and fundamental that it admits of no exception no matter how inconsequential the circumstances." *State v. Vick,* 117 *N.J.* 288, 293, 566 *A.*2d 531 (1989) (holding trial court committed reversible error for failing to instruct jury on State's burden to prove that defendant did not have permit for handgun found in his possession).

The necessity of a jury's reconsideration of the elements of a crime established during an earlier portion of a bifurcated trial was recognized in *State v. Ragland,* 105 *N.J.* 189, 519 *A.*2d 1361 (1986). In *Ragland,* the jury convicted the defendant of several offenses, including unlawful possession of a weapon in violation of *N.J.S.A.* 2C:39–5. *Id.* at 192, 519 *A.*2d 1361. Another charge, possession of a weapon by a convicted felon, *N.J.S.A.* 2C:39–7, was severed to avoid prejudice, but was tried before the same jury. *Ibid.* Before the jury deliberated on the severed count, the trial court instructed the jury that: "[i]f you find that the defendant ... was previously convicted for the crime of robbery and that he was in possession of a sawed-off shotgun, *as you have indicated* ... then you must find him guilty as charged by this Court." *Ibid.* That jury instruction had the effect of directing a guilty verdict on the possession of a weapon by a convicted felon charge. *Id.* at 193, 519 *A.*2d 1361. The Court held that it is "essential ... that the jury be instructed in no uncertain terms to consider anew

the evidence previously admitted [and] to disregard completely its prior verdict." *Id.* at 195, 519 *A*.2d 1361.

The sole function of a penalty-phase jury is to determine the appropriate sentence, and the evidence presented by the State need only be relevant to that issue and not to a defendant's guilt. *Biegenwald, supra,* 106 *N.J.* at 71, 524 *A*.2d 130. However, the distinct nature of the penalty phase allows the jury to "reach conclusions concerning aggravating factors and mitigating factors different from and inconsistent with the findings at the original sentencing proceeding." *Id.* at 72, 524 *A*.2d 130. Further, although the "defendant may lose whatever advantage inheres in the 'residual doubts' that the original jury may have had regarding defendant's guilt, the State may also lose whatever 'advantage' inheres in the emotional impact that often surrounds the initial guilt phase." *Id.* at 71, 524 *A*.2d 130 (citation omitted).

That proposition served in part as a basis for our decision in *State v. Marshall,* 123 *N.J.* 1, 586 *A*.2d 85 (1991), where we held that the State's burden at the penalty phase remains even when an aggravating factor duplicates an element of a crime found by the jury during the guilt phase. *Id.* at 138–39, 586 *A*.2d 85. The aggravating factor alleged, namely that the defendant procured the commission of the offense by payment or promise of payment, was analogous to an element of the crime for which he ·was convicted during the guilt phase of the trial. *Id.* at 138, 586 *A*.2d 85. The defendant argued that by not instructing the jurors to disregard their former factual finding and "deliberate anew," the trial court allowed a directed verdict on the aggravating factor in contravention of *Ragland. Id.* at 138–39, 586 *A*.2d 85 (citing to *Ragland, supra,* 105 *N.J.* at 195–96, 519 *A*.2d 1361).

*Marshall* held that penalty-phase jurors are not bound by findings of fact made by guilt-phase jurors. *Id.* at 139, 586 *A*.2d 85. Because the guilt and sentencing phases are separate proceedings under the Capital Punishment Act, a trial court should instruct a penalty-phase jury "of its duty to deliberate anew concerning any facts established by the verdict in the guilt-phase

determination that the State relies on to prove an aggravating factor, and of its right to reach a different conclusion concerning such facts in the penalty phase." *Ibid.* The Court acknowledged that it would be a "rare case" where "a penalty-phase jury, especially one not presented with any new evidence in the penalty phase, would make penalty-phase determinations that contradict its verdict in the guilt phase." *Ibid.* However, the Court concluded that reversal was unwarranted under the facts of the case before it because "this jury understood clearly that the penalty proceedings were separate from the guilt phase of the case, and required the jury's fresh determination on the existence of aggravating and mitigating factors." *Ibid.*

The Court's holding in *Marshall* is reflected in the model jury charge on the 4(e) aggravating factor—that the defendant procured the commission of the offense by payment or promise of payment of anything of pecuniary value. When the guilt-phase jury finds that the defendant procured a murder by payment or promise of payment, the trial court must instruct the penalty-phase jury to deliberate anew:

> While you have already determined that the defendant procured the commission of the murder by payment or promise of payment of anything of pecuniary value during the guilt phase of the trial, that finding is insufficient for this sentencing proceeding. That is so because the guilt and sentencing phases are considered as separate proceedings. Therefore, you must deliberate anew regarding any facts established by your verdict in the guilt phase determination that the State relies on to prove an aggravating factor, and you have the right to reach a different conclusion about such facts in the penalty phase.

> [*Judges Bench Manual For Capital Causes,* Appendix J–22 (July 17, 2000).]

A similar instruction is required when the alleged aggravating factor is 4(g), that the defendant committed murder in the course of committing, attempting to commit, or fleeing after committing or attempting to commit felony murder (murder in the course of robbery, sexual assault, arson, burglary, kidnaping, or the crime of contempt in violation of *N.J.S.A.* 2C:29–9b). *Judges Bench Manual,* Appendix J–26. However, when the defendant is alleged to have committed murder in the course of murder, the instruction

apparently is not required to be given. *Judges Bench Manual,* Appendix J–26 n. 41. Instead, the trial court need only state:

> I charge you that in order to find the existence of this aggravating factor, you must be satisfied beyond a reasonable doubt of the following: (a) the commission of a [murder] AND (b) that the killing of another victim was caused by the defendant at some time within the course of the commission of that crime which can include flight after the commission of the murder.

[<em>Judges Bench Manual,</em> Appendix J–26.]

The issue raised by defendant is whether the State should be required to reprove the elements of murder to establish that he committed murder in the course of murder pursuant to aggravating factor 4(g). In cases of felony murder, the model jury charge on aggravating factor 4(g) requires the trial court to instruct the penalty-phase jury to disregard the guilt-phase jury's conclusion that the defendant did commit the predicate felony. That is because the commission of the predicate felony constitutes an element of aggravating factor 4(g). Similarly, in the case of murder within murder, where the predicate felony is murder and where murder constitutes an element of aggravating factor 4(g), it follows that the penalty-phase jury should be instructed to deliberate anew in conformance with this Court's holding in *Marshall.* Although the jury in *Marshall* was the same for the guilt and penalty phases, that does not distinguish the *Marshall* holding such that application of the principle of deliberation anew should not occur here. Further, to accomplish that deliberation, the prosecution is required under *N.J.S.A.* 2C:11–3c(2)(c) to reintroduce relevant guilt-phase evidence when the factfinder at the penalty phase is different from the factfinder at the guilt phase.

Defendant argues not that the penalty-phase jury should have been permitted to acquit him of the murders, but that it should have been given an opportunity to consider anew the evidence supporting his convictions and to view it from a different perspective than that of the guilt-phase jury. Properly instructed, the penalty-phase jury could have concluded that the 4(g) aggravating factor should have been accorded less weight in the balancing process in conformance with this Court's holding in *Biegenwald.*

Although the guilt-phase verdict would have remained intact, defendant might have received a sentence of imprisonment in accordance with *N.J.S.A.* 2C:11–3. We conclude, therefore, that the instruction as it appears in our Judges Bench Manual, and as used here, requires correction. Because the charge had the capacity to affect seriously the weighing of aggravating and mitigating factors by a separate penalty-phase jury, its use would have necessitated reversal of defendant's penalty-phase judgment but for our ruling on the jury's own-conduct determination that itself warrants reversal of defendant's death sentence.

### 2. Exclusion of Testimony Criticizing State's Evidence

Defendant contends that the trial court erred in excluding from the penalty-phase criticism of the State's physical evidence, thereby depriving the jury of the ability to consider "residual doubt" in its sentencing decision. Prior to commencement of the penalty trial, the court heard argument on the State's motion to exclude the proposed testimony of a forensic scientist who was hired by defendant to evaluate the physical evidence and to present a crime scene reconstruction for the jury. Defendant sought to call the forensic scientist to illuminate the inadequacies in the State's crime-scene processing and evidence collection. Defendant intended to rely on that testimony with respect to the circumstances of the crime and the State's burden to prove aggravating factor 4(g); to suggest defendant's lesser role in the crime from that of Junior's; and to establish a basis to support a passion/provocation jury charge.

Because residual doubt concerning a defendant's guilt is not relevant to character or the circumstances of the offense, defendants do not have the right under the United States Constitution to have the jury instructed on residual doubt as a mitigating factor. *Franklin v. Lynaugh,* 487 *U.S.* 164, 174, 108 *S.Ct.* 2320, 2327, 101 *L.Ed.*2d 155, 165–66 (1988) (O'Connor, J., concurring). The Eighth Amendment of the United States Constitution limits the penalty-phase jury in capital cases to consider, as a mitigating factor, evidence of "any aspect of a defendant's character or

record and any of the circumstances of the offense." *Lockett v. Ohio*, 438 *U.S.* 586, 604, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978) (White, J., concurring in part and dissenting in part). Similarly, under the New Jersey Constitution, the proffered evidence must be relevant to the aggravating and mitigating factors; therefore, "[r]etrial of issues relevant only to guilt is not permitted." *Biegenwald, supra*, 106 *N.J.* at 71, 524 *A.*2d 130. Thus, "[w]hile defendant may lose whatever advantage inheres in the 'residual doubts' that the original jury may have had regarding defendant's guilt, the State may also lose whatever 'advantage' inheres in the emotional impact that often surrounds the initial guilt phase." *Biegenwald, supra*, 106 *N.J.* at 71, 524 *A.*2d 130 (citation omitted).

Defendant urges reconsideration of our prior decisions, seeking a holding that evidence of residual doubt is admissible at the penalty phase. We decline to do so and reaffirm the principle that the only evidence admissible in the penalty phase is evidence relevant to the aggravating and mitigating factors. Defendant also argues that he was improperly precluded· from presenting evidence that was both critical of the aggravating factors and relevant to the circumstances of the offense. Because we are requiring the State to reprove the elements of murder to establish aggravating factor 4(g), defendant will have the opportunity to criticize the evidence presented in support of aggravating factor 4(g) and to present his own evidence relevant to the circumstances of the offense on retrial.

### 3. Improper Introduction of Evidence of Similarity of Prior Murder

Defendant argues that the prosecutor's introduction of inadmissible evidence of the similarity between the circumstances of defendant's prior murder conviction and the present matter improperly encouraged the imposition of the death sentence. Defendant contends that the prosecutor elicited testimony during the penalty phase that defendant and his prior murder victim worked together in a large marijuana distribution network, a fact that, in

the minds of the jurors, would have linked that murder to the present offenses. Moreover, he says the details of the prior murder, including diagrams of the locations of the wounds, were inflammatory and should not have been admitted. Defendant's point of error includes an argument that the trial court erred by not requiring the State to accept defendant's offer to stipulate to the prior murder conviction. The trial court believed that it could not require the stipulation and, therefore, the State proceeded to call both the New York Assistant District Attorney who prosecuted the prior murder case and the medical examiner who examined the victim.

Our jurisprudence reflects an abiding effort to guard against jury prejudice in the penalty phase of a capital case. *State v. Pitts,* 116 *N.J.* 580, 638–39, 562 *A.*2d 1320 (1989). Other-crimes evidence is of special concern because of its capacity to prejudice the capital-sentencing deliberations. *State v. Pennington,* 119 *N.J.* 547, 586, 575 *A.*2d 816 (1990). The prejudicial effect of prior-conviction evidence is particularly high when the prior conviction is for a similar crime. *State v. Brunson,* 132 *N.J.* 377, 386, 625 *A.*2d 1085 (1993).

In proving the aggravating factor of prior murder, the State may offer evidence of a prior homicide in the form of "the identity and age of the victim, the manner of death and the relationship, if any, of the victim to the defendant." *N.J.S.A.* 2C:11–3c(2)(f). Ordinarily, the existence of a prior murder conviction is established simply by the introduction into evidence of the judgment of conviction. *Simon, supra,* 161 *N.J.* at 460, 737 *A.*2d 1. Because the conviction itself constitutes the statutory aggravating factor, *Ramseur, supra,* 106 *N.J.* at 276, 524 *A.*2d 188, the judgment is introduced for the limited purpose of aiding the jury's determination whether to impose a life or death sentence.

Thus, although the State may offer evidence of a prior conviction to prove the aggravating factor of prior murder, the purpose of *N.J.S.A.* 2C:11–3c(2)(f) is " 'to avoid turning the sentencing proceeding into a second trial of the previous case and

at the same time to provide the jury with some information about the prior conviction.'" *State v. Erazo,* 126 *N.J.* 112, 136, 594 *A.*2d 232 (1991) (quoting *Senate Judiciary Committee Statement to Senate No. 950,* at 2, concerning purpose of *N.J.S.A.* 2C:11–3c(2)(f)).

In *Erazo, supra,* this Court considered thoroughly the constitutionality of *N.J.S.A.* 2C:11–3c(2)(f) and the policy considerations that support it. Rejecting the claim that *N.J.S.A.* 2C:11–3c(2)(f) violated the prohibition against double jeopardy, the Court stated that the statute makes evidence of a prior murder admissible "not for the purpose of punishing defendant for that murder, but to enable the jury to determine the appropriate sentence for the present murder." *Id.* at 134, 594 *A.*2d 232. The Court noted that "[t]he history of c(2)(f) reflects the Legislature's concern about the amount of evidence of prior murders that is admissible on the penalty phase." *Id.* at 136, 594 *A.*2d 232. Reiterating the "need to guard against 'jury prejudice,'" the Court held that in addition to complying with the statutory restrictions on evidence used to prove a prior murder, a trial court also must instruct the jury on the limited relevance of prior-murder evidence. *Id.* at 135–36, 594 *A.*2d 232.

Case law has examined the parameters of various aspects of prior murder that are admissible in a capital penalty trial. *See generally State v. Bey,* 129 *N.J.* 557, 595–97, 610 *A.*2d 814 (1992) (*Bey III*) (stating that medical evidence presented in clinical terminology does not eliminate potentially prejudicial effect and instructing that "manner of death" should be described in general terms); *Pennington, supra,* 119 *N.J.* at 574–75, 575 *A.*2d 816 (citing prosecutor's conduct as "improper" and an attempt to inflame penalty jury in case decided prior to *Erazo* when prosecutor exceeded defense stipulation and court instruction on prior murder by telling jury that defendant " 'blew away half of the victim's face'" and " 'crippled another human being' ").

The amount of prior murder information that should be disclosed concerning a victim's relationship to the defendant has

not been addressed by this Court. Here, the State called the New York Assistant District Attorney who prosecuted the prior murder case. After testifying to the charges against defendant in that case and the age of the prior victim, the witness was asked about the "relationship" between defendant and the prior victim. He replied:

I learned through the trial testimony that [defendant] and the victim as well as Mr. Nicholas [a co-defendant in the prior murder] were not only close friends but also involved in a major drug distribution network involving marijuana.

Defendant objected to the irrelevant and highly prejudicial nature of the testimony. The trial court sustained the objection on the ground that the prosecutor was allowed only to show that defendant and the victim were "friends" and "[a]nything beyond that such as involving a major drug distribution is irrelevant."

We concur with the trial court's ruling. That defendant and the victim were friends is admissible under *N.J.S.A.* 2C:11–3c(2)(f). However, the further circumstances surrounding the nature of the relationship exceeded permissible limits under the statute. The evidence had the ability to prejudice defendant given the similarity between the circumstances surrounding the prior murder and that of the current murders.

Due to the potentially prejudicial effect of the testimony, the trial court gave the jury a curative instruction immediately after the prosecutor elicited the testimony about the New York drug operation. In no uncertain terms, the court instructed the jury not to consider that information in its deliberations:

Ladies and gentlemen, I instruct you that under our law when the State intends to prove that one of the aggravating factors is a prior murder, there's certain limitations that are in place upon it insofar as the proofs are concerned. When evidence is admitted concerning prior murders, nothing of the facts of the murders beyond name and age of [sic] victim, the manner of death and the victim's relationship to the defendant should be allowed. Anything else is irrelevant. Therefore, I instruct you that anything you heard about these people being involved in a major drug distribution business, although you heard it, I can tell you to disregard it but I'm also going to tell you that it's not to be considered at all during your deliberations.

Consistent with this Court's direction in *Erazo, supra,* 126 *N.J.* at 135–36, 594 *A.*2d 232, the court also charged the jury that defen-

dant already had been punished for the prior murder and that they were not to consider the offense for that purpose. We note defendant's argument that the prosecutor raised the issue of defendant's New York drug distribution activities during cross-examination of the mitigation expert and during summation. However, because the mitigation expert's testimony on defendant's New York drug activities was admissible testimony and not stricken from the record, the prosecutor was permitted to discuss that testimony in her summation.

Defendant further contends that the trial court erred by permitting the prosecutor to prove the manner of death in the prior murder with diagrams illustrating the location of the victim's wounds. Specifically, the prosecutor called the medical examiner who performed the autopsy on the victim in the New York case. When the medical examiner took the stand, the prosecutor inquired as to his name, position, and qualifications. The following ensued concerning the autopsy:

Q. Now after completing the autopsy, did you reach a conclusion as to the cause of Philip Rowe's death?

A. Yes, I did.

Q. And did he sustain a gunshot wound to the hand?

A. Yes, he did.

Q. That was a through and through wound?

A. From the back of the left hand through the palm side through and through, correct.

Q. Did he sustain two gunshot wounds to the head?

A. Yes, he did.

Q. Did one enter through the left temple and exit through the ear?

A. That's correct.

Q. And did the other enter through the back of the head and exit through the parietal orbit?

A. On the right side. Yes. True.

Q. Did he sustain any injuries that were consistent with what are known as defensive wounds?

A. Yeah .... [T]here was no such cluster of [defensive] wounds in this case except for an abraded mark that was circular on the back of the left hand but isn't what we would typically call a cluster of defense wounds.

The prosecutor then had the medical examiner identify photographs and diagrams of the wounds that were either taken during the autopsy or prepared by the witness. The diagrams were later admitted over the defense's objection that they were inflammatory.

Defendant's objection is similar to the one raised by the defendant in *Erazo*. At issue in *Erazo* was the admissibility of three pages from the autopsy report from the defendant's prior murder conviction. *Erazo, supra,* 126 *N.J.* at 131, 594 *A.*2d 232. The selected pages described in detail the multiple stab wounds to the victim and contained a diagram showing the location of the wounds. *Ibid.* Noting that the evidence was admitted pursuant to a stipulation by both parties, the Court declined to find plain error. *Id.* at 136, 594 *A.*2d 232. However, because the case was being remanded on other grounds, the Court held that the defendant should not be bound by his prior stipulation in his new trial, reasoning:

> We believe that the statutory purpose can be served with less than the stipulated evidence. The prejudicial effect of a graphic and detailed account of the victim's death might exceed its probative value. On remand, the purposes of the statute will be served if the evidence of the manner of [the former victim's] death is described as multiple stab wounds to the chest, lungs, and heart.
>
> [*Ibid.*]

Similarly, the evidence here presented a graphic and detailed account of the victim's death. For purposes of the statute, the description of the manner of death should have been more general, providing no more detail than that death resulted from two gunshot wounds to the head. However, as the Court similarly found in *Bey II, supra,* 129 *N.J.* at 597, 610 *A.*2d 814, we do not find that the difference between the testimony presented here and the more limited permissible "manner of death" testimony was of such magnitude that it prejudiced the jury, or that it clearly was capable of producing an unjust result. We direct, however, that in the event of a penalty retrial only the more limited and general description of the victim's death should be permitted.

Finally, we turn to the issue of defendant's proposed stipulation to the prior murder. In other contexts, courts have

allowed defendants to stipulate to a prior conviction to avoid the prejudice that can arise when the jury learns of the nature of the prior crime. *See generally Old Chief v. United States,* 519 *U.S.* 172, 174, 117 *S.Ct.* 644, 647, 136 *L.Ed.*2d 574, 584 (1997) (finding that district court's rejection of defendant's stipulation of prior crime constituted abuse of discretion, noting prejudice attendant to jury learning of nature of earlier crime); *Pennington, supra,* 119 *N.J.* at 574–75, 575 *A.*2d 816 (holding that prosecutor's reference to "slashing" that occurred in prior murder constituted improper conduct because it exceeded court's ruling and defendant's stipulation); *State v. Alvarez,* 318 *N.J.Super.* 137, 154, 723 *A.*2d 91 (App.Div.1999) (allowing defendant to stipulate prior conviction, and holding that where defendant's prior conviction was similar to charged offense, only date and sentence are admissible at trial); *State v. Harvey,* 318 *N.J.Super.* 167, 173, 723 *A.*2d 107 (App.Div.1999) (holding that failure to bar disclosure of defendant's past crime constituted abuse of discretion; probative value of prior conviction outweighed by danger of unfair prejudice).

 *N.J.S.A.* 2C:11–3c(2)(f) authorizes the admissibility of evidence relating to a prior murder conviction. However, the statute does not circumscribe the trial court's inherent ability to limit the prejudicial effect of admissible evidence. Trial courts have latitude to control the impact that prior murder conviction evidence may have on the jury. Here, the trial court rejected defendant's proposed stipulation under the belief that it could not compel the prosecutor to enter into a stipulated form of such evidence. The trial court took an unduly narrow view of its ability to act as gatekeeper of the evidence presented to the jury. On retrial, the court should exercise control over the prejudicial effect of prior-murder evidence by requiring, if necessary, that that evidence be submitted by stipulation or other limited form.

### 4. Introduction of Inflammatory Victim–Impact Evidence (Not raised below)

 Defendant contends that during the penalty phase the trial court improperly admitted portions of Emil's guilt-phase

testimony concerning Leon Mitchell's children and the senselessness of the murders. Defendant argues that the penalty-phase jury was presented with Emil's testimony that one of Mitchell's children was born the day after his murder; that Mitchell had eight or nine children; and that the murders were "senseless." We note that defendant neither asked the court to redact Emil's testimony about Mitchell's children, nor objected when the testimony was read to the penalty-phase jury.

■ Victim-impact evidence is admissible for the sole purpose of rebutting mitigating evidence presented by the defendant to support the catch-all mitigating factor 5(h). *N.J.S.A.* 2C:11–3c(6); *State v. Muhammad,* 145 *N.J.* 23, 50–51, 678 *A.*2d 164 (1996). To rebut evidence offered in support of mitigating factor 5(h), the State is limited to presenting "evidence of the murder victim's character and background and of the impact of the murder on the victim's survivors." *N.J.S.A.* 2C:11–3c(6). The victim impact evidence must be relevant and reliable, and its probative value must not be outweighed by "the risk that its admission may pose the danger of undue prejudice or confusion to the jury." *Muhammad, supra,* 145 *N.J.* at 47, 678 *A.*2d 164.

■ To ensure that the admission of victim impact evidence "will not be admitted in a manner that would allow the arbitrary and unconstitutional imposition of the death penalty," *Muhammad* set forth safeguards that must be followed when admitting victim-impact statements into evidence. *Id.* at 53–54, 678 *A.*2d 164. Specifically concerning the substance of a victim's testimony, the statement may include "a general factual profile of the victim, including information about the victim's family, employment, education, and interests." *Id.* at 54–55, 678 *A.*2d 164. It also may include a general description of "the impact of the victim's death on his or her immediate family." *Id.* at 55, 678 *A.*2d 164. However, the testimony must be factual and "free of inflammatory comments or references." *Ibid.* Thus, the testimony may not include "the victim's family members' characterizations and opin-

ions about the defendant, the crime, or the appropriate sentence." *Ibid.*

Based on an examination of Emil's testimony, we are satisfied that the admission of Emil's testimony on victim impact does not constitute plain error. Emil's testimony that Mitchell had eight or nine children and that one of them was born the day after Mitchell's death provided the jury with factual information about the victim's family. Defendant contends that the prejudice resulting from Emil's references to Mitchell's children was exacerbated by Emil's characterization of the murders as "senseless." However, defendant failed to object at the time the testimony was admitted. Defendant's reliance on *State v. Hightower,* 146 *N.J.* 239, 680 *A.*2d 649 (1996), is unpersuasive. In *Hightower,* the jury foreperson disclosed that a member of the jury had heard from a source outside the courtroom that the victim had three children. *Id.* at 249, 680 *A.*2d 649. Here, the circumstances surrounding the admission of the victim impact testimony did not involve the jury acquiring information from outside the courtroom. Rather, the information was admitted in open court and without any objection to it at the time. We decline to disturb the trial court's discretionary decision to admit Emil's victim impact testimony.

### 5. Prosecutor's Remarks During Summation

Defendant cites to numerous instances of prosecutorial misconduct as constituting reversible error. Prosecutorial misconduct is a basis for reversal of a criminal conviction if the conduct was so egregious that it deprived the defendant of the right to a fair trial. *State v. Timmendequas,* 161 *N.J.* 515, 575, 737 *A.*2d 55 (1999), *cert. denied,* —— U.S. ——, 122 *S.Ct.* 136, 151 *L.Ed.*2d 89. When determining whether alleged prosecutorial misconduct meets that standard, we consider "whether defense counsel made a timely and proper objection, whether the remark was withdrawn promptly, and whether the court ordered the remarks stricken from the record and instructed the jury to disregard them." *Ramseur, supra,* 106 *N.J.* at 322–23, 524 *A.*2d 188. Generally, if counsel did not object, the remarks will not be deemed prejudicial.

*Ibid.* There were no objections to any of the remarks that we now examine.

### a. Remarks About Duty to Society

Defendant's first claim is that the prosecutor committed misconduct by advising the members of the jury that it was their duty to sentence him to death. Specifically, defendant argues that when the prosecutor told the jury to consider whether defendant fulfilled his duty as a human being "to assume the right relationship in society," she in fact was telling the jury that it had a duty to society to sentence defendant to death. Although prosecutors are not permitted to encourage juries to convict or impose the death penalty on the basis of a societal duty, *Brown, supra,* 138 *N.J.* at 557, 651 *A.2d* 19, here, the prosecutor only referred to defendant's duty to society, not to the jury's duty to society. Accordingly, we find no prejudice capable of producing an unjust result.

### b. Remark About Experience as a Prosecutor

Defendant contends that the prosecutor informed the jury of her opinion of the case by stating that this was her first time seeking a death sentence. Defendant claims that the implication of the prosecutor's remark was that she had decided against seeking the death penalty in other cases. We have often emphasized the impropriety of a prosecutor's statements of personal beliefs "if the import is or may be that it is based upon facts not before the jury." *Aponte v. State,* 30 *N.J.* 441, 447, 153 *A.2d* 665 (1959). However, a failure to make a timely objection indicates defense counsel's belief that the prosecutor's remarks were not prejudicial at the time they were made. *Timmendequas, supra,* 161 *N.J.* at 576, 737 *A.2d* 55 (citing *State v. Irving,* 114 *N.J.* 427, 444, 555 *A.2d* 575 (1989)). In context here, we note that the prosecutor's remark followed defense counsel's statement in his summation that this was the second time he had represented a capital defendant at penalty phase in his thirty-three years of

experience. In that setting it is difficult to infer that the prosecutor's response was so plainly prejudicial. Adding to that defense counsel's failure to object to the prosecutor's statement, we find that defendant has not demonstrated plain error.

### c. Remarks About Failure to Testify

Defendant's third claim relates to the prosecutor's reference to the medical examiner's testimony as "uncontradicted," and the State's proof of the aggravating factors as "based on objective testimony and ... rooted in uncontradicted, irrefutable facts and evidence." By way of contrast, the prosecutor argued that the defense failed to set forth sufficient evidence to support the mitigating factors. Defendant maintains that those remarks highlighted defendant's decision not to take the stand on his own behalf.

Although comment on the evidence and its significance to the jury is permitted, prosecutors may not discuss the significance of testimony not presented. *State v. Sinclair*, 49 *N.J.* 525, 548–49, 231 *A.*2d 565 (1967). Further, if the prosecutor infers that there are no other witnesses other than the defendant who could have testified, there is a danger that the prosecutor may impermissibly reflect on the defendant's Fifth Amendment right not to testify. *Id.* at 549, 231 *A.*2d 565.

Defendant fails to show how the prosecutor's statements alluded to his decision not to testify. He was not the only witness who could have refuted the State's evidence on the aggravating factors. The prosecutor permissibly argued that, qualitatively, the evidence set forth by defendant regarding the mitigating factors was not sufficient to overcome the weight of the evidence presented by the State in support of the aggravating factors. Thus, we are satisfied that the prosecutor's attempt to depreciate the significance of defendant's mitigating evidence did not unfairly prejudice defendant.

### d. Remarks About Inadequacies of Defense Expert

Defendant's next claim is that the prosecutor unfairly criticized the testimony of Carmeta Albarus, defendant's mitigation specialist. The prosecutor stated that defendant was "certainly no scapegoat, to use Ms. Albarus's term." The prosecutor also suggested reasons for discrediting Albarus, noting that Albarus "is a paid professional" who "makes her living as a mitigation specialist" and who is a member of organizations "that believe that the death penalty is never an appropriate punishment for murder." Shortly thereafter, the prosecutor attacked Albarus's credibility by telling the jury that Albarus's testimony reminded her "of a statement made by the great showman P.T. Barnum, always have a little something for everybody." The prosecutor added that Albarus "drew conclusions of a psychosocial nature, conclusions unsupported by any objective fact or outside review" and that the conclusions were "tainted and influenced by her professional and her philosophical bias." After citing instances when Albarus conceded that she did not consider certain evidence or speak with certain individuals, such as psychiatrists, defendant's father, and the police, the prosecutor urged the jury to find that defendant failed to demonstrate a link between his upbringing and his role in the murders.

A prosecutor may suggest to the jury that the defense's presentation of the evidence was unbalanced and incomplete. *Timmendequas, supra,* 161 *N.J.* at 593, 737 *A.*2d 55. A prosecutor's statements on the deficiency of a defendant's defense and the inferences to be drawn therefrom are permissible as long as they are grounded in the record. *Id.* at 594, 737 *A.*2d 55. In assessing the worth of the defense's case, the jury is entitled to "consider whether it was receiving a full picture, as interest and bias are always relevant." *Ibid.*

We reject defendant's argument that the prosecutor unfairly criticized his mitigation expert. Here, there was a sufficient basis for the prosecutor to urge the jury to find that Albarus's testimony was incomplete and inaccurate. It is a fact that Albarus

failed to speak with psychologists or psychiatrists in preparing her report, even though she explained that she did not need to do so because she was retained only to collect information on defendant's social history. Regarding the prosecutor's allegations that Albarus's testimony was tainted by her professional and philosophical bias against the death penalty, we note that the prosecutor may inform the jury of any possible bias that may have influenced the jury, despite a witness's statement that she did not "profess" to that viewpoint. For those reasons, and because defendant did not object at trial, we find that the comments were not capable of producing an unjust result.

### e. Remarks About Defendant's Relationship with Son

Defendant also claims that the prosecutor improperly suggested that defendant used his young son, Ringo, to arouse sympathy. Defendant argues that the prosecutor improperly commented that the presentation of a videotape of Ringo talking about his father was " 'very sad 'cause the defense has exploited a six-year-old to play on your emotions.' " Defendant asserts that his relationship with his son was a legitimate mitigating factor and that the prosecutor's comments improperly suggested that such evidence should be rejected as an insufficient excuse for murder.

Defendant compares the prosecutor's comments to those made in *Marshall*. In *Marshall*, the prosecutor in summation told the jury that it was "obscene" for the defendant to call his three sons to testify as defense witnesses, stating " 'for that there's a place in hell for him.' " *Supra*, 123 *N.J.* at 159, 586 *A.*2d 85. Although denying the defendant's motion for a mistrial, the trial court issued a curative instruction. *Id.* at 160, 586 *A.*2d 85. We agreed with the defendant that those remarks were "inflammatory and highly emotional, possessing the capacity to anger and arouse the jury and thereby divert them from their solemn responsibility to render a verdict based on the evidence." *Id.* at 161, 586 *A.*2d 85. However, because the prosecutor spoke only about a "distinctly collateral aspect of trial" and because the trial court issued a

curative instruction, we held that the prosecutor's misconduct did not warrant reversal. *Ibid.*

Here, the prosecutor's remarks did not have the same incendiary capacity. The comments went only to a "collateral aspect of trial," and because defendant did not object to them at trial, we are satisfied that the prosecutor's remarks were not clearly capable of producing an unjust result.

C. Alleged Error in Jury Charge During Penalty Phase

Defendant contends, for the first time on appeal, that he is entitled to a new penalty-phase trial because the court failed to inform the jury of the exact length of the New York sentence. He argues that the trial court's omission of the exact length of the New York sentence in the jury instructions violated his Eighth Amendment rights under *Simmons v. South Carolina*, 512 *U.S.* 154, 114 *S.Ct.* 2187, 129 *L.Ed.*2d 133 (1994).

"A capital sentencing jury must be fully informed of its responsibility in determining the appropriateness of the death penalty." *State v. Loftin*, 146 *N.J.* 295, 370, 680 *A.*2d 677 (1996) (citing *Woodson v. North Carolina*, 428 *U.S.* 280, 304–05, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976)). As was explained in *Ramseur, supra*, "[t]o· hide from the jury the full range of its sentencing options, thus permitting its decision to be based on uninformed and possibly inaccurate speculation, is to mock the goals of rationality and consistency required by modern death penalty jurisprudence." 106 *N.J.* at 311, 524 *A.*2d 188. Generally, in capital sentencing proceedings, the trial court should inform the jury of prior sentences being served by the defendant "because that information may bear on the jury's thought process in determining the adequacy of a life sentence as opposed to death." *Cooper, supra*, 151 *N.J.* at 373, 700 *A.*2d 306; *Bey III, supra*, 129 *N.J.* at 603, 610 *A.*2d 814 (noting that jury's "sentencing decision may be affected by uncertainty about whether the defendant has been punished adequately for the earlier murder," when prior murder is presented as aggravating factor); *Loftin, supra*, 146 *N.J.* at 372, 680 *A.*2d 677 (stating that jury should be informed of

defendant's prior sentences if "there is a reasonable likelihood that [the judge] will impose a sentence to be served consecutively to any of defendant's prior sentences").

However, a trial court is not required to inform the jury about a defendant's prior sentence absent a request by the defendant or an inquiry by the jury. *Bey III, supra,* 129 *N.J.* at 603, 610 *A.*2d 814. Defendant concedes that he made no such request at trial. However, he contends that the failure to inform the jury of the length of the New York sentence constituted plain error, and alternatively, that a jury inquiry was made in the form of a request to clarify the verdict sheet.

We disagree that the jury instructions prejudiced defendant. The jury was told on numerous occasions that if it did not vote for death, defendant would be sentenced to two life terms with sixty years of parole ineligibility to run consecutive to his New York sentence. Specifically, in his opening statement, defense counsel informed the jury that defendant "will never get out of prison," and that even without the New York sentence the earliest defendant would be released is when he is eighty-seven years old. Defense counsel reminded the jury of that fact in his closing argument. In addition, the court charged the jury that if defendant was not sentenced to death for both victims, it "would impose consecutive life sentences with 60 years to be served before parole eligibility which sentence shall be made to be served consecutively to the sentence imposed in the State of New York." Because the jury was adequately informed of its sentencing options and the effect the prior sentence would have on the present sentence, we find that the omission in the jury instructions of the exact length of defendant's prior murder sentence does not constitute plain error.

Regarding the jury's inquiry made in the form of a request to clarify the verdict sheet, we note that the inquiry in question was as follows:

A and B refer to a unanimous decision on which set of factors outweigh the other and on what the appropriate punishment is. C refers to the punishment with no

reference to the factors. Are we being asked to unanimously agree on both the factors and the punishment?

Nothing in that inquiry pertained to the New York sentence. Indeed, in addition to answering the jury's question, the court clarified that the total amount of parole ineligibility that it would impose would be sixty years since the sentences would be made to run consecutively.

Finally, defendant urges us to reconsider our holding in *Loftin, supra,* to the extent that it interpreted *Simmons, supra.* In *Simmons,* the United States Supreme Court held that when future dangerousness is alleged as an aggravating factor, and the defendant is ineligible for parole under state law, the jury must be informed that the defendant is ineligible for parole. 512 *U.S.* at 156, 114 *S.Ct.* at 2193, 129 *L.Ed.*2d at 138. As we noted in *Loftin, Simmons* is not applicable in New Jersey because "future dangerousness" is not an aggravating factor in New Jersey. 146 *N.J.* at 371, 680 *A.*2d 677. We recently reaffirmed *Loftin* in *Koskovich, supra,* 168 *N.J.* at 531–32, 776 *A.*2d 144. Defendant presents no novel argument or law that undermines our holding in *Loftin,* and thus we reaffirm that *Simmons* is inapplicable to our jurisprudence on aggravating factors.

### D. Penalty–Phase Jury's Alleged Failure to Vote Individually on Aggravating Factors

We now turn to defendant's last penalty-phase issue. He contends that the jury reached a non-unanimous verdict in the penalty phase, as evidenced by the fact that it initially concluded, without formal vote that either one or the other aggravating factors had been proven. In response, the State argues that the record demonstrates that the jurors were in agreement that the State had proven both aggravating factors (4(a) and 4(g)) beyond a reasonable doubt. Given the "overwhelming evidence" presented at trial, the State maintains that "no reasonable juror" could have concluded otherwise. Further, the State asserts that because the jurors were convinced that either one or the other factor outweighed the mitigating factors, there was no risk that the jury

would have reached a different conclusion had it been instructed to weigh both aggravating factors against the mitigating factors.

Our death penalty statute requires the jury's verdict to "set[ ] forth in writing the existence or nonexistence of each of the aggravating and mitigating factors." *N.J.S.A.* 2C:11–3c(3). If the jury finds "that all of the aggravating factors outweigh beyond a reasonable doubt all of the mitigating factors, the court shall sentence the defendant to death." *N.J.S.A.* 2C:11–3c(3)(a). See *Bey II*, 112 *N.J.* at 158–59, 548 *A.*2d 887 (1988) (citing *Biegenwald, supra,* 106 *N.J.* at 62–63, 524 *A.*2d 130). However, if the jury finds that "all of the aggravating factors which exist do not outweigh all of the mitigating factors," a sentence of imprisonment is imposed. *N.J.S.A.* 2C:11–3c(3)(b). "By requiring that the jury be unanimous on the imposition of the death penalty, the statute assures that each juror must accept full responsibility for the imposition of that sanction." *Bey II, supra,* 112 *N.J.* at 157, 548 *A.*2d 887.

Requiring a unanimous finding on the existence of the aggravating factors is consistent with the general requirement of unanimous verdicts in criminal actions. *Id.* at 159, 548 *A.*2d 887. And, as important as correct jury instructions are in all criminal cases, they have enhanced significance in capital cases. *Id.* at 162, 548 *A.*2d 887. Because "we do not allow aggravating factors to be totaled up as bean-counters would do," *State v. Moore,* 122 *N.J.* 420, 473, 585 *A.*2d 864 (1991), the jury charge must instruct the jurors to make a normative judgment that all of the aggravating factors do or do not outweigh all of the mitigating factors. *Bey II, supra,* 112 *N.J.* at 162, 548 *A.*2d 887.

Further, a specific charge on the requirement for unanimity is necessary when " 'there is a danger of a fragmented verdict.' " *State v. Parker,* 124 *N.J.* 628, 637, 592 *A.*2d 228 (1991), *cert. denied,* 503 *U.S.* 939, 112 *S.Ct.* 1483, 117 *L.Ed.*2d 625 (1992) (quoting *United States v. North,* 910 *F.*2d 843, 875 (D.C.Cir.), *vacated in part and rev'd in part on rehearing,* 920 *F.*2d 940 (D.C.Cir.1990)). The risk of a fragmented penalty-phase verdict is

present when there are multiple aggravating factors and the court's instructions fail to make clear that the jurors have to be unanimous as to the existence of each. *State v. Harris,* 141 *N.J.* 525, 564, 662 *A.2d* 333 (1995) (stating "when there are potentially two aggravating factors ... the possibility of a patchwork verdict might genuinely exist"). In *State v. DiFrisco,* 137 *N.J.* 434, 645 *A.2d* 734 (1994), the defendant argued that the court's instructions permitted a death sentence where six jurors found one aggravating factor and six jurors found another aggravating factor. *Id.* at 489, 645 *A.2d* 734. Among those instructions was the statement that " '[i]f [the jurors] individually and unanimously find that the State has proven one or more aggravating factors beyond a reasonable doubt and beyond a reasonable doubt such factor or factors outweigh the mitigating factor or factors ... then the punishment shall be death.'" *Id.* at 490, 645 *A.2d* 734. This Court found no error in that instruction, in part, because it made explicit the requirement for unanimous agreement on aggravating factors. *Id.* at 491–92, 645 *A.2d* 734. In addition, any error was rendered harmless by the verdict sheet and the polling of the jury, which together demonstrated the jurors' correct understanding of the law. *Id.* at 492, 645 *A.2d* 734.

The present circumstances leave no doubt that the jurors misunderstood the instructions on the unanimity requirement for each aggravating factor. Although the jurors were instructed by the trial court, and were reminded on the verdict sheet that they had to find the aggravating factors unanimously and beyond a reasonable doubt, they apparently understood that to mean that each juror only had to "agree[ ] that one or both of the aggravating factors was proven." Indeed, when the trial court learned that the jurors had interpreted the charge to mean that the individual aggravating factors need not be found unanimously, it agreed that their "interpretation was a reasonable one" and that the court's "explanation was not as clear as it should have been." Accordingly, after discussion with counsel, the trial court sent the jurors back to vote separately on each of the aggravating factors. However, the jurors were not required to weigh again the aggravating

factors that they found existed against the mitigating factors. Nonetheless, as noted, the jurors had informed the court that they had concluded that either aggravating factor, individually, or both weighed together, outweighed the mitigating factors. Thus, the court's action succeeded in eliminating the risk that any aggravating factor was found to exist without a unanimous vote by the jury. Reweighing was not required in light of the jury's earlier disclosure.

We have held that errors "that strike at the core of the jury's obligation to balance the aggravating and mitigating factors in accordance with statutory requirements and prior case law" are not rendered harmless merely because the evidence is " 'overwhelming.' " *Koskovich, supra,* 168 *N.J.* at 540, 776 *A.*2d 144. In a capital sentencing it is essential that each juror individually determine whether each mitigating factor exists and then individually decide whether the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. *State v. Papasavvas,* 163 *N.J.* 565, 628, 751 *A.*2d 40 (2000). Here, a question arose concerning the unanimity of the findings on the aggravating factors. The polling of the jury had informed the court of the jury's weighing of each aggravating factor compared to the mitigating factors, and the combined weight of the aggravating factors compared to the mitigating factors.

The desire for certainty should have led the trial court to have the jury engage in a reweighing of any aggravating factor found unanimously. But, under the circumstances, we view the remoteness of prejudice as not rising to the level of concern voiced in *Koskovich, supra.* Here, aggravating factor 4(a), prior murder, was found unanimously. Defendant made no attempt to refute it during the penalty-phase trial and the State's evidence left no room for doubt. Further, the jury had informed the court that either aggravating factor, standing alone, outweighed the mitigating evidence. The court's actions eliminated the initial unanimity question concerning aggravating factor 4(a). Thus, we view this issue of error as harmless under the circumstances.

## IV.

### Additional Issues

#### A. Standard of Proof of Circumstantial Evidence for By–Own–Conduct Murder

Our dissenting colleagues contend that this case highlights the need to impose a higher burden of proof than "beyond a reasonable doubt" on the by-own-conduct determination in a capital prosecution based on evidence of a circumstantial nature. Unsatisfied with the jury's determination that defendant committed murder by his own conduct thus triggering his death eligibility, the dissent seeks to impose a heightened "no doubt" standard of proof on that determination when circumstantial evidence exclusively is involved. Although the desire for certainty is an understandably human, and humane, response when criminal consequences hang in the balance, we do not agree that the facts in this record warrant so dramatic an alteration in our jurisprudence.

The beyond-a-reasonable-doubt standard of proof is imposed by our Code of Criminal Conduct for conviction of all offenses under the Code. *N.J.S.A.* 2C:1–13. In addition, murder convictions require certain precise findings, made by the jury unanimously applying the beyond-a-reasonable-doubt standard, in order to proceed to a capital penalty phase as well as for imposition of a capital sentence. See *N.J.S.A.* 2C:11–3(c) (requiring for death eligibility finding that defendant committed murder by own-conduct); *Brown, supra,* 138 *N.J.* at 511, 651 *A.*2d 19 (holding jury must be satisfied beyond reasonable doubt that defendant committed murder by own conduct to proceed to penalty phase). The elimination of all reasonable doubt from each and every juror's mind involves an extremely thorough and deliberate fact-finding process. It is a process that has worked well for hundreds of years.

We are confident that no capital conviction in this State that has been upheld on appeal or on post-conviction review has posed a serious question about guilt. Careful review of the record in each

case convinced the jury and this Court that no real doubt existed about the defendant's guilt by own conduct. All of our capital determinations were made using the beyond-a-reasonable-doubt standard that appropriately instructs the jury concerning the necessary degree of certainty to render their determination reliable. See Model Jury Charges (Criminal), Preliminary Instructions to the Jury in Non–Capital Cases (Feb. 24, 1997) (explaining that prosecution must prove charges by more than a preponderance, but not necessarily to an absolute certainty, noting "[i]n this world, we know very few things with absolute certainty").

Although not dispositive, numerous jurisdictions have rejected the call for a different and heightened standard of proof where circumstantial evidence is involved. Of those federal circuit courts of appeal that have considered the question, all have declined to adopt a higher standard in the context of circumstantial evidence. *See generally United States v. Olbres*, 61 *F*.3d 967, 970 (1st Cir.) ("So long as the evidence, taken as a whole, warrants a judgment of conviction, 'it need not rule out other hypotheses more congenial to a finding of innocence.' "), *cert. denied*, 516 *U.S.* 991, 116 *S.Ct.* 522, 133 *L.Ed.*2d 430 (1995); *United States v. Sawyer*, 294 *F*.2d 24, 31 (4th Cir.) (noting that prosecution is not required to exclude every hypothesis except that of guilty beyond reasonable doubt and stating that jury is responsible for weighing evidence to find guilt beyond reasonable doubt), *cert. denied*, 368 *U.S.* 916, 82 *S.Ct.* 196, 7 *L.Ed.*2d 132 (1961); *United States v. Prieur*, 429 *F*.2d 1237, 1238 (6th Cir.1970) (holding "it is not necessary that [circumstantial evidence] remove every reasonable hypothesis except that of guilt").

The federal courts follow the appellate standard set forth in *Jackson v. Virginia* for assessing the sufficiency of the evidence, whether direct or circumstantial, to support a criminal conviction. The "relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia, supra*, 443 *U.S.* at 319,

99 *S.Ct.* at 2789, 61 *L.Ed.*2d at 573. The Supreme Court explained that that standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Ibid.* The Court explicitly declined to adopt a higher standard of proof for circumstantial evidence.

Case law from other state courts has echoed the principles contained in the circuit court decisions, and has rejected arguments calling for a heightened standard for circumstantial evidence in capital cases. See *People v. Hall,* 194 *Ill.*2d 305, 252 *Ill.Dec.* 653, 743 *N.E.*2d 521, 536 (2000) (applying *Jackson v. Virginia* standard in affirming capital murder convictions based on circumstantial evidence, noting that "[c]ircumstantial evidence is sufficient to sustain a criminal conviction, provided that such evidence satisfies proof beyond a reasonable doubt"), *cert. denied,* —— U.S. ——, 122 *S.Ct.* 393, 151 *L.Ed.*2d 297 (2001); *Commonwealth v. Begley,* 566 *Pa.* 239, 780 *A.*2d 605, 615–19 (2001) (applying *Jackson v. Virginia* standard to circumstantial evidence used to convict defendant of first-degree murder and kidnapping and to sustain his death sentence); *State v. Carruthers,* 35 *S.W.*3d 516, 558 (Tenn.2000) (upholding capital conviction based on circumstantial evidence using appellate standard set forth in *Jackson v. Virginia* ), *cert. denied,* 533 *U.S.* 953, 121 *S.Ct.* 2600, 150 *L.Ed.*2d 757 (2001).

In our state, the *Reyes* standard is in full accord with the federal appellate standard for review of the sufficiency of the evidence. It is the apt standard of review here. Moreover, we do not deviate from the beyond-a-reasonable-doubt standard because circumstantial evidence is involved. We decline to reform our burden of proof jurisprudence simply because the dissent contends that the prosecution should not be able to retry defendant capitally based on its disagreement with the jury's outcome on the by-own-conduct finding.

B. Constitutionality of New Jersey Death Penalty Statute

■ Defendant and *amici curiae,* the Association of Criminal Defense Lawyers of New Jersey, the American Civil Liberties

Union of New Jersey, and New Jerseyans for a Death Penalty Moratorium, seek reconsideration of the constitutionality of the New Jersey Death Penalty Statute, *N.J.S.A.* 2C:11–3c, under the Eighth Amendment to the United States Constitution and Article I, paragraph 12 of the New Jersey Constitution. The asserted bases for reconsideration are that the death penalty is inconsistent with evolving standards of decency, is administered in an inconsistent and unreliable manner, and does not rationally further any legitimate penological objective.

We have upheld the constitutionality of New Jersey's death penalty statute in each and every year since we last examined the issue in 1987 in *Ramseur. See, e.g., Koskovich, supra,* 168 *N.J.* at 541, 776 *A.*2d 144 (citing in 2001 to *Ramseur* and holding that death penalty statute does not violate either federal or state constitutional prohibitions against cruel and unusual punishment); *Simon, supra,* 161 *N.J.* at 483–84, 737 *A.*2d 1 (reaffirming in 1999 *Ramseur* and prior decisions upholding constitutionality of death penalty statute); *Cooper, supra,* 151 *N.J.* at 379, 700 *A.*2d 306 (reaffirming in 1997 *Ramseur* and prior decisions); *Harris, supra,* 141 *N.J.* at 574, 662 *A.*2d 333 (affirming in 1995 *Ramseur*); *Martini, supra,* 131 *N.J.* at 221–22, 619 *A.*2d 1208 (same in 1993); *Moore, supra,* 122 *N.J.* at 486, 585 *A.*2d 864 (rejecting in 1991 as unjustified defendant's request that Court depart from prior rulings on death penalty); *Pitts, supra,* 116 *N.J.* at 597–98, 562 *A.*2d 1320 (reaffirming *Ramseur* in 1989). Nothing submitted in this appeal warrants departure from that uninterrupted chain of decisional law.

That said, we add the following. In assessing whether a form of punishment selected by a democratically elected legislature constitutes cruel and unusual punishment, we must consider whether the punishment conforms with contemporary standards of decency. *Ramseur, supra,* 106 *N.J.* at 169, 524 *A.*2d 188. Community standards of decency and morality are not static. However, the constitutional test for cruel and unusual punishment must rest on objective and reliable data reflecting the evolving stan-

dards of the community. *Gregg v. Georgia*, 428 *U.S.* 153, 175, 96 *S.Ct.* 2909, 2926, 49 *L.Ed.*2d 859, 876 (1976). The United States Supreme Court has stated, as have we, that the " 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.' " *Atkins v. Virginia*, —— *U.S.* ——, ——, 122 *S.Ct.* 2242, 2247, 153 *L.Ed.*2d 335, —— (2002) (citing *Penry v. Lynaugh*, 492 *U.S.* 302, 331, 109 *S.Ct.* 2934, 2953, 106 *L.Ed.*2d 256, 286 (1989)); *Ramseur; supra*, 106 *N.J.* at 172, 524 *A.*2d 188 (finding legislative action to be strong, objective evidence of contemporary moral standards). We continue to adhere to that view and note the Court's recent reaffirmation in *Atkins* of legislative action as the most reliable indicator of evolving standards of decency. *Atkins, supra*, —— *U.S.* at —— – ——, ——, 122 *S.Ct.* at 2247–48, 2252, 153 *L.Ed.*2d at —— – ——, —— (cataloguing states with statutes prohibiting imposition of death penalty on mentally retarded defendants to conclude that test for evolving standards of decency would be violated by imposing death penalty on such individuals). Unless rebutted by other similarly reliable evidence of community standards, we give deference to the Legislature's understanding of the moral values of our State's citizens. *Ramseur, supra*, 106 *N.J.* at 172, 524 *A.*2d 188.

Since our Legislature's enactment of a death penalty statute, we are unaware of any substantial effort within the Legislature to rescind or retrench from its support for the death penalty. Indeed, at times when the Legislature has disagreed with this Court's decisions, perceiving them as curbing or infringing on the death penalty statute's application, the Legislature has reacted with clarifying legislation and even a constitutional amendment to reassert the Act's vitality. See *L.* 1993, *c.* 111 (responding to *Gerald, supra*, and amending Article I, Section 12 of New Jersey Constitution by popular vote to provide that "[i]t shall not be cruel and unusual punishment to impose the death penalty on a person convicted of purposely or knowingly causing serious bodily injury resulting in death who committed the homicidal act by his own conduct"); *L.* 1992, *c.* 5 (amending *N.J.S.A.* 2C:11–3e). The

Legislature's continued support for the death penalty is strong evidence of the community's moral judgment approving the availability of that penalty. Moreover, thirty-eight other states have death penalty legislation; thirty-seven did when *Ramseur* was decided. *State By State Death Penalty Information: States with the Death Penalty*, http:www.deathpenaltyinfo.org/firstpage.html (last visited July 3, 2002); *Ramseur, supra*, 106 *N.J.* at 173, 524 *A.*2d 188. That, too, supplies objective evidence in support of the view that the death penalty does not offend current standards of decency. The moratoriums imposed by the governor in two of those thirty-eight states because of concern about the reliability of such sentences imposed in those states does not, in our view, affect the conclusion that contemporary community standards are not offended by the availability of a death sentence in appropriate cases.

In *Ramseur*, we acknowledged that the actions of juries also can be a form of reliable evidence of the community's standards of decency. *Ramseur, supra*, 106 *N.J.* at 173, 524 *A.*2d 188 (stating that because actions of jurors constitute a "true reflection of society's morality," jury verdicts constitute another form of objective and reliable evidence to assess contemporary standards of decency). Examination of data compiled by our Administrative Office of the Courts concerning capital prosecutions over the last ten years indicates that from 1992 to Fall 2001 there have been sixty-nine capital trials. In those trials, juries have found the necessary aggravating factors that outweighed the mitigating factors and that resulted in twenty-two sentences of death. We recognize that since the time of the Ramseur decision, the number of verdicts imposing the death sentence has declined; nonetheless, it remains the case that juries still are finding that a sentence of death is appropriate for some defendants. As in *Ramseur*, if we regard the actions of those juries as a reliable reflection of society's moral values, the fact that juries continue to return verdicts imposing the death penalty provides additional reliable support for the conclusion that the death penalty does not violate present standards of decency. *Ibid.*

In this appeal, defendant and the *amici* have brought to our attention a recent survey conducted by the Eagleton Center for Public Interest Polling. The survey indicates that sixty percent of New Jersey residents polled support the imposition of the death penalty for murder. Eagleton Institute of Politics, New Jerseyans' Opinions on a Death Penalty Moratorium (May 2002). When we considered the constitutionality of the death penalty statute in *Ramseur,* we observed in a footnote that a public opinion poll at that time indicated that approximately seventy-two percent of New Jersey residents supported the death penalty. *Supra,* 106 *N.J.* at 174 n. 10, 524 *A.*2d 188. Defendant and the *amici* maintain that the Eagleton survey evidences a change in public support for the death penalty in New Jersey that warrants our reexamination of the constitutionality of that legislatively decreed sanction. Although the constitutional test for cruel and unusual punishment requires that we consider evolving changes in the community's shared values concerning decency in punishment, we do not regard a change in a public opinion poll from seventy-two percent in 1987 to sixty percent in 2002 to be sufficiently significant for that purpose.

Public opinion poll data is not as reliable or objective as legislative enactments or jury verdicts in assessing whether the punishment of death conforms with contemporary standards of decency. We did not rely on public opinion poll data in our holding in *Ramseur,* and neither did the United States Supreme Court in *Atkins. Ibid.; Atkins, supra,* —— *U.S.* at —— n. 21, 122 *S.Ct.* at 2249 n. 21, 153 *L.Ed.*2d at —— n. 21 (noting in footnote simply that polling data supports consensus against executions of mentally retarded persons otherwise reflected in legislative changes enacted in numerous states across nation). We decline to regard the reported percentage change in public opinion poll data as a persuasive basis for departing from our well-established precedent on this subject. We therefore reaffirm *Ramseur,* and subsequent case law upholding the constitutionality of New Jersey's death penalty statute. *Ramseur, supra,* 106 *N.J.* at 190, 524

A.2d 188 (holding death penalty statute constitutional under United States and New Jersey Constitutions).

### Conclusion

We affirm defendant's non-capital convictions and the judgment of conviction of purposeful or knowing murder. However, the determination of murder by own conduct is reversed based on prejudicial error in the jury instructions. We reaffirm the constitutionality of the death penalty statute. Defendant's death sentences are set aside and the matter is remanded for further proceedings consistent with our disposition. Defendant's proportionality claims are preserved.

COLEMAN, J., concurring in part and dissenting in part.

I concur with the majority that the sequential charge was so prejudicial to defendant that it had the effect of depriving him of a fair trial on the "by own conduct" death-eligibility issue. The Court, however, requires a new trial. I disagree that a new capital murder trial should be conducted because I conclude that the evidence was insufficient as a matter of law to support the jury's determination on the "by own conduct" issue even if the jury had been properly instructed. Hence, I would preclude a second trial on death eligibility.

### I.

Our death penalty statute makes defendant death eligible only if he purposely or knowingly caused the death of one or more of the victims "by his own conduct." *N.J.S.A.* 2C:11–3c. That means defendant must have *"actively and directly participated* in the homicidal act, *i.e.,* in the infliction of the injuries from which the victim died. The critical elements are that defendant in fact acted, and the immediacy of his conduct to the victim's demise." *State v. Gerald,* 113 *N.J.* 40, 97, 549 *A.*2d 792 (1988). The "by own conduct" requirement is a triggering event for determining whether a defendant is death eligible, *State v. Moore,* 113 *N.J.* 239, 300–01, 550 *A.*2d 117 (1988), which the State must prove beyond a

reasonable doubt. *Id.* at 299, 550 *A.*2d 117. Consequently, an examination of the evidence to determine whether it was sufficient to establish the "by own conduct" requirement is necessary.

The "by own conduct" issue was of great concern to the trial court because the State relied exclusively on circumstantial evidence to prove death eligibility. None of the physical evidence recovered or tested forensically specifically connected defendant directly to the shootings of McLean, Mitchell or Williams. Additionally, none of the testimonial evidence connected defendant directly to the shootings. As the trial court summarized: "Except for the testimony of Emil Josephs that he heard shots from two different caliber guns and testimony from neighbors that they heard thumping and rat-a-tat sounds, the evidence as to what occurred to precipitate the shootings is very sparse and almost nonexistent." In rejecting defendant's motion for a judgment of acquittal based on a claim that the evidence was insufficient to sustain a verdict of murder by defendant's own conduct, the trial court stated that the "fact that Hugh was seen with only one gun and the gunshot wounds sustained by the victims were caused by two or three guns sufficiently established the inference that a second gunman helped Hugh shoot the victims."

Defendant contends that the testimony of Emil Josephs that Hugh fired a nine millimeter handgun at Emil as Emil leaped from the kitchen window was the only direct evidence of who was in possession of a handgun used in the murders. He argues that the jury's verdict is based on speculation because the only direct evidence in the case concerning his whereabouts prior to the murders came from Emil who testified that defendant was observed sleeping in his bedroom hours before the murder.

In addressing the "by own conduct" issue, the majority has framed the question presented as "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Post,* at 81, 803 *A.*2d at 1095 (citing *Jackson v. Virginia,* 443 *U.S.* 307, 319, 99 *S.Ct.* 2781, 2789,

61 *L.Ed.*2d 560, 573 (1979)). I submit that in this death penalty case, the question should be whether proof of "by own conduct" should be allowed to rest exclusively on circumstantial evidence where inferences are not based on independently proven facts. My answer is no. I believe that to allow proof of an essential precondition to death eligibility based exclusively on circumstantial evidence "allow[s] impermissibly discretionary findings and death sentences based on the slimmest of evidence." *State v. Ramseur,* 106 *N.J.* 123, 208, 524 *A.*2d 188 (1987), *cert. denied,* 508 *U.S.* 947, 113 *S.Ct.* 2433, 124 *L.Ed.*2d 653 (1993).

## II.

### A.

The death penalty as a form of punishment is categorically different. *Furman v. Georgia,* 408 *U.S.* 238, 286, 92 *S.Ct.* 2726, 2751, 33 *L.Ed.*2d 346, 376 (1972) (Brennan, J., concurring). " '[T]he imposition of death by public authority is . . . profoundly different from all other penalties.' " *State v. Ramseur, supra,* 106 *N.J.* at 326, 524 *A.*2d 188 (quoting *Lockett v. Ohio,* 438 *U.S.* 586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978)).

> "From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."
>
> [*Mickens v. Taylor,* 535 *U.S.* ——, ——, 122 *S.Ct.* 1237, 1253, 152 *L.Ed.*2d 291 (2002) (Stevens, J., dissenting) (quoting *Gardner v. Florida,* 430 *U.S.* 349, 357–58, 97 *S.Ct.* 1197, 1204, 51 *L.Ed.*2d 393 (1977)).]

For that reason, our federal constitution requires extra protections for defendants who stand "in deadly peril of their lives." *Powell v. Alabama,* 287 *U.S.* 45, 71, 53 *S.Ct.* 55, 65, 77 *L.Ed.* 158, 171 (1932). To that end, a "heightened reliability [is] demanded by the Eighth Amendment in the determination whether the death penalty is appropriate in a particular case." *Sumner v. Shuman,* 483 *U.S.* 66, 72, 107 *S.Ct.* 2716, 2720, 97 *L.Ed.*2d 56, 63 (1987).

That Amendment "draw[s] its meaning from the evolving standards of decency that mark the progress of a maturing society." *Atkins v. Virginia,* —— *U.S.* ——, ——, 122 *S.Ct.* 2242, 2247, 153 *L.Ed.*2d 335, —— (2002) (quoting *Trop v. Dulles,* 356 *U.S.* 86, 100–01, 78 *S.Ct.* 590, 598, 2 *L.Ed.*2d 630, 642 (1958)).

The notion that a sentence of death is different has caused some scholars and commentators to disagree with the majority's application of the typical non-capital "beyond a reasonable doubt" standard to capital cases, rather than the more stringent "beyond any doubt" standard. *See, e.g.,* Sherry F. Colb, *The Qualitative Dimension of Fourth Amendment "Reasonableness",* 98 *Colum. L.Rev.* 1642, 1674 (1998) (stating that "[t]he Supreme Court . . . has rested an entire jurisprudence of capital punishment on the premise that state killing is *sui generis* and that noncapital precedents sometimes provide insufficient protection when applied in the capital context. The Court has declared by way of justification that 'death is different.' "); Stephen P. Garvey, *Death–Innocence and the Law of Habeas Corpus,* 56 *Alb. L. Rev.* 225, 233 (1992) (stating that "[d]eath is different, and doctrinally its distinctness is expressed by this attention to moral detail. Nothing of moral relevance must be disregarded or overlooked."); Note, *The Rhetoric of Difference and the Legitimacy of Capital Punishment,* 114 *Harv. L.Rev.* 1599, 1603 (2001) (distinguishing between "legal guilt (the state of having been tried with due process of law and found guilty) and actual guilt (the state of having actually committed some crime)" and noting that the Supreme Court "has made . . . procedural adjustments to attempt to ensure that a legally guilty capital defendant is actually guilty of a capital crime."); Laura S. Underkuffler, *Agentic and Conscientic Decisions in Law: Death and Other Cases,* 74 *Notre Dame L.Rev.* 1713, 1729 (1999) (citing Supreme Court cases that describe uniqueness of death penalty and stating that "[a]s a result of this uniqueness, it is particularly critical that the correct decision in each case be made, and correctness requires that all factors, circumstances, and aspects of the case be heard and weighed, without hindrance, by the sentencer.").

In addition, the Model Penal Code bars death where "although the evidence suffices to sustain the verdict, it does not foreclose all doubt respecting the defendant's guilt." Margery Malkin Koosed, *Averting Mistaken Executions By Adopting The Model Penal Code's Exclusion Of Death In The Presence Of Lingering Doubt,* 21 *N. Ill. U.L.Rev.* 41, 50–51 (2001) (quoting *Model Penal Code* § 210.6(1)(f)). The commentary notes that "[t]his provision is an accommodation to the irrevocability of the capital sanction. Where doubt of guilt remains, the opportunity to reverse a conviction on the basis of new evidence must be preserved, and a sentence of death is obviously inconsistent with that goal." *Ibid.* "It may not be a 'reasonable doubt' but it is a real doubt nonetheless, in the sense that those who possess it 'can be expected to resist those who would impose the irremedial penalty of death.'" *Id.* at 55 (quoting *Smith v. Balkcom,* 660 *F.2d* 573, 581 (5th Cir.1981), *cert. denied,* 459 *U.S.* 882, 103 *S.Ct.* 181, 74 *L.Ed.2d* 148 (1982)). Indeed, prior to "the mid–1700's, jurors may have been allowed to acquit on the basis of any doubt," and the reasonable doubt standard "was likely a concession to prosecutors." *Id.* at 72.

Professor Koosed observes that concession has been costly:

A report prepared by James Liebman and a team of lawyers and criminologists at Columbia University, A Broken System: Error Rates in Capital Cases, 1973–1995, at 6–7 (June 12, 2000), reveals:

The "overall error rate" for the entire 1973–1995 period, i.e. the proportion of fully reviewed capital judgments overturned at one of the three stages (direct appeal, post-conviction, and/or federal habeas corpus) due to serious error, was 68%. On retrial, when the errors are cured, "an astonishing 82% (247 out of 301) of the capital judgments that were reversed were replaced on retrial with a sentence less than death, or no sentence at all. In the latter regard, 7% (22/301) of the reversals for serious error resulted in a determination on retrial that the defendant was not guilty of the capital offense."

[Koosed, *supra,* 21 *N. Ill. U.L.Rev.* at 108 (quoting Kamisar, LaFave & Israel *Modern Criminal Procedure* 80–81 (9th ed, 2000 Supp.) (quoting the study)).]

That study was updated in February 2002 and recommended that capital cases should require a higher standard of proof—beyond any doubt—rather than proof beyond a reasonable doubt. James S. Liebman, et al., *A Broken System, Part II: Why There Is So*

*Much Error In Capital Cases, And What Can Be Done About It,*
at 397–99 (Feb. 11, 2002), *available at* http://justice.policy.net/
cjreform/dpstudy/ (last visited June 6, 2002).

More than fifty years ago, this Court adopted the "beyond any
doubt" standard for criminal cases in which the State relied
substantially on circumstantial evidence to prove a defendant's
guilt. In *State v. Donohue,* 2 *N.J.* 381, 390–91, 67 *A.*2d 152 (1949),
this Court held that, to justify a murder conviction based largely
on circumstantial evidence,

> all of the circumstances not only must concur to indicate a defendant's guilt but
> they must also be inconsistent with any other rational conclusion. It is not enough
> that they coincide to render probable the hypothesis advanced by the prosecution;
> they must also exclude beyond a reasonable doubt every other hypothesis except
> that of guilt. *Jackson v. Delaware, L. & W.R. Co.,* 111 *N.J.L.* 487, 170 *A.* 22 (E. &
> A.1933). Where the essential facts are proved, and where they cannot be rationally
> explained on any theory other than that the defendant is guilty of the crime
> charged, such circumstantial evidence will be considered as convincing as evidence
> of a direct and positive character.
>
> [*Ibid.*]

That formulation was later rejected in favor of what has become
known as the *State v. Reyes* "beyond a reasonable doubt" stan-
dard. *State v. Mayberry,* 52 *N.J.* 413, 436–37, 245 *A.*2d 481 (1968)
(stating that the *Donohue* standard has been repudiated because it
would have defeated too many legitimate circumstantial prosecu-
tions based on speculative hypotheticals consistent with the defen-
dant's innocence). I believe the Court should adopt the *Donohue*
"beyond any doubt" standard for "by own conduct" death-eligibili-
ty determinations in cases in which the State relies exclusively, or
nearly exclusively, on circumstantial evidence. By restricting that
standard to such death-eligibility determinations, the problem
associated with defendant's advancing speculative hypotheticals
consistent with innocence will not be presented because the pur-
pose of such a standard is to separate principals from accomplices
rather than the guilty from the innocent.

B.

The majority has used the principles articulated in *State v.
Reyes,* 50 *N.J.* 454, 236 *A.*2d 385 (1967), that establish the stan-

dard in criminal cases for determining whether to submit a case to the jury for its ultimate determination. Although this Court in *State v. Gerald* concluded that the relevant inquiry concerning the "by own conduct" issue is whether or not the defendant actively and directly participated in the homicidal act, *i.e.*, in the infliction of the injuries from which the victim died, the Court in *Gerald* did not indicate whether *Reyes* was the appropriate standard to be used in making that determination. The Court has, however, addressed the sufficiency of the evidence to prove an aggravating factor. Those cases are helpful in deciding whether to submit a "by own conduct" issue to the jury. For instance, to submit to the jury the aggravating factor of whether the defendant committed the murder to escape detention, *N.J.S.A.* 2C:11–3c(4)(f), "the State [must] produce[ ] sufficient evidence on which a jury can reasonably conclude that at least one of the motives of the defendant in killing his or her victim was to eliminate a witness or avoid subsequent apprehension and prosecution for criminal acts." *State v. Martini*, 131 *N.J.* 176, 282–83, 619 *A.*2d 1208 (1993), *cert. denied*, 516 *U.S.* 875, 116 *S.Ct.* 203, 133 *L.Ed.*2d 137 (1995).

In *State v. Hunt*, 115 *N.J.* 330, 388, 558 *A.*2d 1259 (1989), the defendant contended that the State failed to present sufficient evidence that the murder of the victim involved either "torture" or an aggravated battery, which is required to establish an aggravating factor under c(4)(c). The evidence in *Hunt* established that the victim was stabbed twenty-four times, was shocked by the attack and bled for twenty minutes before dying. *Id.* at 389, 558 *A.*2d 1259. The State relied solely on the twenty-four stab wounds to establish aggravating factor c(4)(c). Notably, the Court expressed concern that "if the c(4)(c) factor could be sustained on this evidence alone, there would be 'no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not.'" *Ibid.* (quoting *Godfrey v. Georgia*, 446 *U.S.* 420, 433, 100 *S.Ct.* 1759, 1767, 64 *L.Ed.*2d 398, 409 (1980)). Because the State was barred on other grounds from seeking the death penalty, however, the Court found that it did

not need to determine whether proof of the aggravating factor was insufficient to support submission of that factor to the jury. *Ibid.*

Also helpful to the analysis is a rule of law established nearly half-a-century ago in *State v. Lucas,* 30 *N.J.* 37, 51, 152 *A.*2d 50 (1959), where the Court held that a defendant could not be convicted of felony murder (a capital offense at that time) based solely on defendant's uncorroborated confession. The Court required "the extrinsic corroborative proofs . . . be of such a nature as to give the confession an aura of authenticity." *Id.* at 52, 56, 152 *A.*2d 50. That evidentiary ruling was established to minimize the chances that innocent people would be executed. *Id.* at 56–57, 152 *A.*2d 50. A similar rational standard of reliability should be required for a "by own conduct" determination. Indeed, this Court in *State v. DiFrisco,* 118 *N.J.* 253, 280, 571 *A.*2d 914 (1990), *cert. denied,* 516 *U.S.* 1129, 116 *S.Ct.* 949, 133 *L.Ed.*2d 873 (1996), applied the *Lucas* principle and vacated defendant's death sentence following a guilty plea because there was no corroboration of defendant's confession. *DiFrisco* observed that *Lucas* "is a rule of evidence" that applies to both the guilt and sentencing phases of the State's case. *Id.* at 270, 571 *A.*2d 914.

In *DiFrisco,* the issue was whether there was sufficient evidence to corroborate the defendant's confession that Franciotti had paid the defendant to kill Potcher, the owner of Jack's Pizzeria. The Court stated that the

> pointed question is whether there was, within the circumstances of the case, corroboration of Franciotti's role as one who paid the hired gun to kill in order to avoid detection. Surely these surrounding circumstances bespeak the crime. There is no known connection between DiFrisco and the pizzeria owner. Why else would he have done it? Is the fact that there is no other explanation enough corroboration?
>
> [*Ibid.*]

Despite those compelling circumstances, the Court nonetheless concluded that the absence of corroborating evidence of the confession meant that the confession was not reliable enough to allow a sentence of death to stand, notwithstanding the fact that the defendant's confession had been found to be admissible as evi-

dence. *Id.* at 273, 571 *A.*2d 914. Here, as in *DiFrisco*, reliability is the missing link in the case absent some direct or independently reliable evidence of "by own conduct."

Defendant also was convicted of conspiracy to commit murder, a non-capital offense. A *Lucas*-type reliability standard has been applied in conspiracy cases where the Court has held that there must be independent proof of the conspiracy before a co-conspirator's statements can be used against the co-conspirator. *State v. Phelps*, 96 *N.J.* 500, 519, 476 *A.*2d 1199 (1984). It is indeed ironic that in the conspiracy charge against defendant in this case the judge was obligated to determine whether there was independent evidence "substantial enough to engender a belief in the conspiracy's existence and the defendant's participation," *ibid.*, yet in the capital murder charges against defendant the judge was not required to consider the reliability of the circumstantial evidence presented to establish death eligibility. *Id.* at 509–10, 476 *A.*2d 1199.

Of the more than fifty cases on death row in New Jersey, this is the first case in which the "by own conduct" issue seriously has been called into question. In all of our capital cases in which multiple persons have been accused of causing the death of a victim, there always was some direct evidence to satisfy the "by own conduct" and/or direct participation in the events that led to the victim's death. Some cases in which we have reversed a judgment of death demonstrate this Court's requirement that a sentence of death be grounded in highly reliable evidence.

The need for reliability begins at the earliest stages of a death penalty prosecution. In *State v. McCrary*, 97 *N.J.* 132, 143, 478 *A.*2d 339 (1984), the Court stated that giving notice of aggravating factors, which is the first step in a capital case, is like seeking an indictment. That is, it "is the notion that the allegations derive from some verifiable source. The need to ensure that such a source exists compels some preliminary review to satisfy the interest of the public and the defendant that such charges not proceed to trial without a factual mooring." *Ibid.*

Numerous cases in which multiple defendants have been charged with inflicting fatal injuries have required direct evidence of "by own conduct." For example, *State v. Simon*, 161 *N.J.* 416, 439–41, 737 *A.*2d 1 (1999), involved a case in which two individuals were charged as the trigger person in the murder of a police officer "by own conduct." In that case, the Court noted that although there were two defendants charged with the capital murder of a single victim, there was a threshold showing made before the Grand Jury demonstrating how the defendant, Simon, directly participated in causing the death of the victim. *Ibid.* The Court pointed out that the Grand Jury considered evidence that Simon was the passenger and that the shot causing death was fired from the passenger side of the vehicle. *Id.* at 440, 737 *A.*2d 1. In addition, Simon exited the passenger side of the vehicle with the murder weapon in his hand within minutes after the murder. *Ibid.* In view of that evidence, the Court concluded there was a sufficient *prima facie* showing that Simon was the one who murdered the victim by his own conduct, although he was one of two defendants who had been charged with a murder that involved only one shooter. *Ibid.*

Similarly, in *State v. Clausell*, 121 *N.J.* 298, 309, 580 *A.*2d 221 (1990), two defendants were indicted for capital murder. The petit jury found both Clausell and his co-defendant guilty of purposeful or knowing murder and found that Clausell, but not his co-defendant, had committed the homicidal act by his own conduct. *Id.* at 312, 580 *A.*2d 221. Because there was direct evidence of Clausell's direct participation in the homicidal act, this Court neither questioned nor criticized the fact that two defendants in the single-shooter murder were charged with capital murder for killing the same individual. This case is different from *Simon* and *Clausell*; in fact, it is the first time that there is no direct evidence of "by own conduct" when multiple defendants have been charged with inflicting the fatal injuries.

After this Court's decision in *State v. Gerald*, *supra*, 113 *N.J.* at 89, 549 *A.*2d 792, which held that the New Jersey Constitution

prohibited the death penalty for serious bodily injury murders, and until the Constitution was amended effective December 3, 1992, this Court set aside several death penalties based on insufficient evidence. In *State v. Gerald, supra,* 113 *N.J.* at 89–92, 549 *A.*2d 792, the Court concluded that despite the nature and multiplicity of injuries inflicted upon the victim, the jury could not infer intent to cause death rather than serious bodily injury. In *State v. Moore, supra,* 113 *N.J.* at 302, 550 *A.*2d 117, the Court concluded that the facts in the case did not support the jury's finding that the defendant committed the homicidal act by her own conduct. In that case, several persons were accused of committing the homicidal act and the record did not satisfy the requirement that defendant had delivered one of the fatal blows. *Ibid.* Similarly, in *State v. Matulewicz,* 115 *N.J.* 191, 194, 201, 557 *A.*2d 1001 (1989), the Court held that the c(4)(c) aggravating factor evidence was insufficient to show that defendant intended to cause physical pain in addition to death. The Court was unwilling to infer that factor from the circumstances of the crime. *Ibid.* So too, in *State v. Perry,* 124 *N.J.* 128, 173–76, 590 *A.*2d 624 (1991), the Court reversed a death sentence because the evidence was insufficient to establish the c(4)(c) aggravating factor. Likewise, in *State v. Rose,* 112 *N.J.* 454, 531–33, 548 *A.*2d 1058 (1988), the Court found insufficient evidence to submit the depravity aggravating factor to the jury. The Court observed that a jury cannot infer depravity, which focuses on the defendant's state of mind, solely from the means used to cause the death. *Ibid.*

Clearly, our death penalty jurisprudence has stressed "the importance of providing a jury with every opportunity to spare a defendant's life." *State v. Cooper,* 151 *N.J.* 326, 362, 700 *A.*2d 306 (1997), *cert. denied,* 528 *U.S.* 1084, 120 *S.Ct.* 809, 145 *L.Ed.*2d 681 (2000). One such illustration is permitting a jury to return a non-unanimous verdict on "by own conduct" death eligibility. *State v. Brown,* 138 *N.J.* 481, 509–14, 651 *A.*2d 19 (1994). Consistent with that view, our Court has stated "death should not be imposed as a result of what may be an extremely close determination." *State v.*

*Matulewicz, supra,* 115 *N.J.* at 200, 557 *A.*2d 1001 (quoting *State v. Ramseur, supra,* 106 *N.J.* at 206, 524 *A.*2d 188).

In *State v. Hightower,* 146 *N.J.* 239, 282–83, 680 *A.*2d 649 (1996) (Handler, J., concurring in part and dissenting in part), Justice Handler noted that the record revealed little credible evidence supporting the argument that, in killing the victim, the defendant was motivated by a fear of identification and thus committed the murder to avoid apprehension, an aggravating factor under c(4)(f). Justice Handler contended that "[a]t a minimum, in order to demonstrate sufficient evidence, the State must proffer factual evidence that is independently significant to each factor." *Id.* at 281, 680 *A.*2d 649. Additionally, he found the State's reliance on indirect circumstantial evidence troubling since such evidence could be "shaped and directed ... to support different motives for murder." *Ibid.*

### C.

Other states that have addressed the issue of the standard required to prove "by own conduct" in death penalty cases also have made the distinction between circumstantial and direct evidence. In circumstantial evidence cases, some courts require the state to prove the defendant's guilt not only beyond a reasonable doubt, but to the exclusion of every reasonable hypothesis consistent with innocence. *See Davis v. State,* 314 *Ark.* 257, 863 *S.W.*2d 259, 264 (1993), *cert. denied,* 511 *U.S.* 1026, 114 *S.Ct.* 1417, 128 *L.Ed.*2d 88 (1994); *Darling v. State,* 808 *So.*2d 145, 155 (Fla.2002); *Bullard v. State,* 263 *Ga.* 682, 436 *S.E.*2d 647, 650–51 (1993); *People v. Jones,* 105 *Ill.*2d 342, 86 *Ill.Dec.* 453, 475 *N.E.*2d 832, 835 (1985), *cert. denied,* 489 *U.S.* 1040, 109 *S.Ct.* 1174, 103 *L.Ed.*2d 236 (1989); *State v. Neal,* 796 *So.*2d 649, 657 (La.2001), *cert. denied,* —— *U.S.* ——, 122 *S.Ct.* 1323, 152 *L.Ed.*2d 231 (2002); *Brewer v. State,* 725 *So.*2d 106, 133 (Miss.1998), *cert. denied,* 526 *U.S.* 1027, 119 *S.Ct.* 1270, 143 *L.Ed.*2d 365 (1999).

Of special significance is *Cummings v. State,* 715 *So.*2d 944, 949 (Fla.1998), where the court concluded that the evidence was

insufficient to support defendant's conviction for premeditated murder and reversed the judgment and death sentence. The evidence showed that a fight ensued between Karlon Johnson and one of the co-defendants, Andre Fisher. *Id.* at 946. A witness testified that defendant Cummings was upset about this and asked for a ride to get his gun. *Ibid.* Another witness testified that, some time after the fight, he saw the defendant in a car with an "Uzi-type gun" on his lap and the defendant asked about the fight and inquired as to the whereabouts of Johnson. *Ibid.* Later that evening, a white Honda Accord drove by the house where Johnson's sister and her children lived and Johnson frequently stayed. *Ibid.* Johnson's car was parked in the carport of his sister's house. *Ibid.* Shelton Lucas, Sr., Johnson's brother-in-law, who is the same height and weight as Johnson and wore clothes similar to those worn by Johnson earlier that evening, was standing in the carport when he noticed the car driving down the street. *Ibid.* Lucas, Sr. testified that he had taken about ten steps through the kitchen and into the living room before the passenger in the car fired at least thirty-five shots at the house from three different nine millimeter guns. *Id.* at 946, 949. Several bullets struck Johnson's car, penetrated the kitchen door, and one of the bullets struck and killed five-year-old Shelton Lucas, Jr. *Id.* at 946. A witness testified that the white Honda Accord passed him shortly before the shooting and there were four people in the car, including Fisher, and that the owner of the car was Marion King. *Ibid.* Lastly, the witness testified that the following day the defendant told him that, if the police ask him, he should say that they were together the previous evening at his cousin's house. *Ibid.*

The bullet that struck the child was consistent with a bullet fired from a gun similar to one of three nine millimeter guns fired from the car into the house, but the State's expert was unable to link it conclusively with the defendant. *Id.* at 946-47. In reversing the conviction, the Florida court concluded that it could not rule out the possibility that the defendant and his cohorts merely intended to frighten Johnson or to damage his car and there was

insufficient proof of premeditation to convict on first-degree murder and impose the death sentence. *Id.* at 949.

The reasoning in that Florida case is applicable here. Although defendant may have had a motive to kill Emil for ordering defendant out of the apartment and fighting with Junior, or even McLean for disarming defendant, there is no direct evidence that defendant murdered the victims by his own conduct. Although premeditation is the essential element which distinguishes first-degree murder from second-degree murder in Florida, see *Hoefert v. State,* 617 *So.*2d 1046, 1048 (Fla.1993), in New Jersey, the "by own conduct" standard is one of three triggering devices to find a defendant guilty under the death penalty statute, *N.J.S.A.* 2C:11–3c. See *State v. Gerald, supra,* 113 *N.J.* at 99, 549 *A.*2d 792. Here, the State argues that three different victims were killed with three different guns. Although the ballistics expert testified the bullets were fired from three different guns, he also stated that some of the bullets were fired from a forty-five caliber gun, some from a nine millimeter gun, and the sole thirty-eight caliber bullet recovered could have been fired from a nine millimeter gun. He further testified that the discharged shells fell into only two groups, indicating that they were fired by two guns. Thus, it is reasonable to infer that one nine millimeter weapon and a forty-five caliber gun were used as the murder weapons. Therefore, there is no direct evidence that defendant used or handled the murder weapons or that Junior did not use two different guns to murder the victims. Emil's testimony that he heard shots coming from two different guns also is consistent with that theory. Therefore, the possibility that there were only two guns, both used by Junior to murder the victims, cannot be ruled out. Additionally, the State's argument that multiple shooters were involved due to the distinct locations of the victims is unpersuasive since two of the victims' bodies were found in close proximity to the kitchen where Junior attempted to shoot Emil.

In *Hall v. State,* 403 *So.*2d 1319, 1320 (Fla.1981), the evidence established that the two defendants approached the victim, who

was carrying a shotgun. The victim was later found dead, and the defendants were observed fleeing the scene and subsequently exchanged gunfire with a sheriff. *Ibid.* The weapon used to murder the victim was found under the victim's body, while the victim's shotgun was found inside the car in which the defendants fled. *Ibid.* The court determined that those facts

> demonstrate[d] beyond a reasonable doubt that the two [defendants] engaged in a common criminal scheme. As such, each was a principal to the death, and the fact that the state did not prove which [defendant fired on the victim did] not necessitate either's acquittal. By actively operating together each was guilty of the acts of the other.

> *[Ibid.]*

Although it was clear that one of the two defendants shot the victim, the court concluded that the evidence was insufficient to prove premeditation beyond a reasonable doubt because the proof of intent was subject to conflicting interpretations. *Id.* at 1320–21. The circumstantial evidence was "inconsistent with any reasonable hypothesis of innocence as to the [murder], but it [was] not inconsistent with any reasonable exculpatory hypothesis as to the existence of premeditation." *Id.* at 1321. The conviction for first-degree murder, therefore, was reversed. *Ibid.*

Similarly, the circumstantial evidence in this case, at best, establishes that defendant was an accomplice in the murders. Since accomplices are not subject to the death penalty under the "by your own conduct" requirement, *State v. Simon, supra,* 161 *N.J.* at 441, 737 *A.*2d 1, it follows that defendant should not be subjected to the death penalty even if the circumstantial evidence establishes that he was engaged in a common criminal scheme. The evidence is insufficient to prove that defendant committed a murder by his own conduct, since the evidence implicating defendant in the murder of the victims is subject to conflicting interpretation as previously stated. Although the circumstantial evidence may be inconsistent with any reasonable hypothesis of innocence as to the murder of the decedents, it is not inconsistent with any reasonable exculpatory hypothesis as to the "by own conduct" requirement.

The Mississippi Supreme Court has recognized that " '[f]acts not directly proved but which jurors legitimately may infer from other facts which have been proved, are limited to such as naturally follow as being logically connected or related, and which reasonably derive from such established facts.' " *Hester v. State*, 463 *So.*2d 1087, 1093 (Miss.1985) (quoting *Matula v. State*, 220 *So.*2d 833, 836 (Miss.1969)). Thus, "a guilty verdict based upon circumstantial evidence must be supported by a much higher degree of proof." *Ibid.* The court stated:

"It is fundamental that convictions of crime cannot be sustained on proof which amounts to no more than a possibility or even when it amounts to a probability, but it must rise to the height which will exclude every reasonable doubt; that when in any essential respect the state relies on circumstantial evidence, it must be such as to exclude every other reasonable hypothesis than that the contention of the state is true."

[*Ibid.* (quoting *Westbrook v. State*, 202 *Miss.* 426, 32 *So.*2d 251, 252 (1947)).]

In *Hester, supra,* the court addressed the prosecution's hypothesis that after the defendant and the victim left a bar, they drove to a trailer park where they struggled and the defendant ultimately robbed and stabbed the victim to death. *Id.* at 1088. The prosecution's hypothesis relied on a witness's observation of the defendant and the victim leaving the bar together; two hours later the defendant returned disheveled and alone; a folding knife seized from the defendant's trailer with small traces of blood and no fingerprints; and a pathologist's statement that the victim's wounds were consistent with the type of knife. *Id.* at 1089–90.

The court found that the circumstances in the case supported the prosecution's contention that the defendant killed the victim with the knife, but the evidence did not exclude the reasonable hypothesis asserted by the defendant that, outside the bar, the defendant and the victim parted ways, the victim was killed by a third party, and the defendant's condition upon returning to the bar was due to an unrelated incident. *Id.* at 1093. The court concluded, therefore, that the "web of circumstances" established by the State did not exclude the reasonable hypothesis that a third party, rather than the defendant, murdered the victim. *Id.* at 1094. Furthermore, the evidence connecting the defendant to the

murder weapon was weak, since the prosecution failed to connect the blood on the knife to the victim's blood or show that the knife belonged to or was used by the defendant. *Id.* at 1092. The court reversed the defendant's conviction because the evidence only presented a probability that the defendant murdered the victim. *Id.* at 1094. Likewise, in this case, the "web of circumstances" established by the State fails to exclude the reasonable hypothesis that defendant was involved in the murder of the victims, presenting only at most a probability that defendant caused the injuries that resulted in the victims' deaths.

In *White v. State*, 532 *So.*2d 1207, 1221 (Miss.1988), the court found that although the evidence was more than sufficient to establish beyond a reasonable doubt that the defendant and the co-defendants robbed the victim, that the victim was killed during the course of the robbery, and that the defendant was present when the killing occurred, the evidence concerning the events before and after the robbery offered no indication as to which defendant killed the victim. While the felony-murder rule only required the defendant to have been an active participant in the robbery when the victim was killed, the court stated that the Mississippi legislature had directed "that greater culpability be required before the death penalty is imposed," presumably more than accomplice liability. *Id.* at 1221 n. 2. Further, there was no evidence that the defendant contemplated lethal force and no direct evidence to place the defendant at the scene with the co-defendants at the time the victim was killed. *Id.* at 1221. Although the defendant was seen leaving the scene with a gun in his hand, there was no proof linking the gun to the crime or the defendant prior to the shooting, and the murder weapon was not introduced as evidence at the trial. *Ibid.* The court also found the evidence was "wholly consistent with numerous other scenarios by which [the defendant] did not kill or anticipate a killing," but in fact, other reasonable hypotheses suggested that either of the co-defendants could have been the murderer. *Ibid.* Therefore, the court found that there was a "pure absence of any proof on the elements contained in the sentencing statute" because

nothing in the record offered the jury a rational basis for selecting one hypothesis over the other. *Ibid.*

In this case, merely circumstantial evidence places defendant in the apartment with Emil at the time of the victims' deaths. Although Delores claims that she saw either defendant or Junior place something into his pocket, there is no other evidence that that occurred or if it did, there is no evidence that the object was a gun. There also is no direct evidence that defendant handled or fired the murder weapons, because no murder weapon was received as evidence at the trial. Moreover, the evidence is consistent with a number of other scenarios in which the defendant did not kill or participate in the killing. As previously stated, at least one other reasonable hypothesis suggests that Junior alone was the murderer. Nothing in this record offered the jury a rational basis for selecting one hypothesis over the other and, therefore, the "by own conduct" requirement under the death penalty statute has not been met.

Conversely, in *State v. Anthony*, 776 *So.*2d 376, 386(La.), *cert. denied*, 531 *U.S.* 934, 121 *S.Ct.* 320, 148 *L.Ed.*2d 258 (2000), the court found that the state was not required to show that the defendant actually pulled the trigger. Instead, to successfully carry its burden, the state was required to prove only that the "defendant acted in concert with his co-perpetrators, that defendant had the specific intent to kill, and that one of the [aggravating factors] was present." *Ibid.* Although the defendant contended that the evidence was insufficient to prove that he was the triggerman, the court found that the circumstantial evidence was sufficient. *Ibid.* Specifically, the defendant stood in the doorway brandishing a gun with a potato on the barrel immediately before the victims were shot; the defendant ordered the victims to their knees and was the last perpetrator seen by the sole survivor, just before the latter was shot; the defendant's shoes were the most heavily encrusted with potato particles of all the co-defendants; and the defendant was repeatedly present at the residence where the weapon later was found on the day of the murder. *Ibid.*

That case is distinguishable from the facts in this case because the State failed to prove that defendant acted in concert with Junior. In fact, the direct evidence establishes only that Junior brandished a gun and attempted to kill Emil. Moreover, the medical evidence clearly revealed that all three victims were shot by a nine millimeter gun that was last seen in Emil's possession. Finally, and most importantly, accomplice liability is insufficient to impose a sentence of death in New Jersey.

### III.

I believe that a heightened standard of reliability should be used to decide the "by own conduct" issue in death penalty cases and that the *Reyes* standard that the Court uses today—the same used to determine whether an individual should be found guilty or innocent of possession of a marijuana cigarette—should not be used in determining whether an accused can be executed. Despite the fact that this Court has reversed thirty-seven of fifty-two death penalties imposed since 1982 because of trial error, some of which related to the "by own conduct" death-eligibility determination, the Court today has nonetheless declined to adopt a standard that will improve the reliability of death-eligibility determinations. The "by own conduct" death-eligibility determination in this case is based exclusively on weak circumstantial evidence that consists of inferences not based on independently proven facts. Thus, the quality of the evidence undermines confidence that the death-eligibility determination is reliable, thereby leading me to the conclusion that the sentence of death also is unreliable. I am unwilling to tolerate "discretionary findings and death sentences based on the slimmest of evidence." *State v. Ramseur, supra*, 106 *N.J.* at 208, 524 *A.*2d 188. "Circumstantial evidence cases are always better candidates for penalty leniency than direct evidence convictions." *King v. Strickland*, 748 *F.*2d 1462, 1464 (11th Cir. 1984), *cert. denied*, 471 *U.S.* 1016, 105 *S.Ct.* 2020, 85 *L.Ed.*2d 301 (1985).

That lack of confidence in the machinery of death is what has prompted governors across this nation to declare a moratorium on death penalty prosecutions and executions, including most recently the decisions announced by the governors of Illinois and Maryland. *See also* Sharone Levy, *Righting Illinois' Wrongs: Suggestions For Reform And A Call For Abolition,* 34 *J. Marshall L.Rev.* 469 (2001) (discussing the cases of thirteen exonerated men in Illinois where "although the prosecution had mostly circumstantial evidence and unreliable witnesses, it still was able to convince a judge and jury to convict those men of murder and sentence them to death"). Apart from that growing lack of confidence is the reality that recently the 101st person condemned to die was found to be innocent and was released from death row in Pennsylvania. *Pennsylvania Man is 101st Exonerated Death Row Inmate,* (May 6, 2002), *available at* http://www.deathpenaltyinfor.org/101Exonerated.html.

The growing national concerns about the reliability of the machinery of death has not escaped New Jersey. A May 2002 survey of New Jersey residents conducted by the Eagleton Institute of Politics of Rutgers University regarding residents' views on the death penalty indicates that sixty-six percent of the residents support a temporary halt to executions. Eagleton Institute of Politics, Center for Public Interest Polling, *New Jerseyans' Opinions on A Death Penalty Moratorium,* at 4 (May 2002). One of the reasons for such a halt is the potential for convicting and executing innocent people. In fact, the survey indicated that ninety-six percent of New Jersey residents believe that innocent people are sometimes convicted of murder. *Id.* at 5. "While we do not regard public opinion polls as decisive [on] issues of constitutional law, we cannot ignore their relevance to the largely empirical determination of" whether the public has confidence in our death penalty system. *State v. Ramseur, supra,* 106 *N.J.* at 174 n. 10, 524 *A.*2d 188. In the interest of reducing the chances that defendants improperly would be found to be death eligible, I would adopt the proof "beyond any doubt" standard articulated in *State v. Donohue* for determining "by own conduct" death eligibili-

ty. Because that higher standard was not satisfied in this case, the State should be precluded from retrying defendant for capital murder. I believe the " 'law triumphs when the natural impulses aroused by a shocking crime yield to the safeguards ·which our civilization has evolved for an administration of criminal justice at once rational and effective.'" *State v. Purnell,* 126 *N.J.* 518, 546, 601 *A.*2d 175 (1992) (quoting *Watts v. Indiana,* 338 *U.S.* 49, 55, 69 *S.Ct.* 1347, 1350, 93 *L.Ed.* 1801, 1807 (1949)).

Chief Justice PORITZ and Justice LONG join in this opinion.

LONG, J., concurring in part and dissenting in part.

I join in Justice Coleman's thoughtful opinion that would impose a higher standard for the use of circumstantial evidence to prove "own conduct" in a capital case.

I write separately to express my disagreement with the conclusion expressed in Point IV of the majority opinion that because the death penalty was declared constitutional in *State v. Ramseur,* 106 *N.J.* 123, 524 *A.*2d 188 (1987), that issue is resolved. In my view, and for the reasons I have previously expressed in detail, the constitutionality of the New Jersey death penalty requires reassessment. *State v. Koskovich,* 168 *N.J.* 448, 776 *A.*2d 144 (2001) (Long, J., concurring in part and dissenting in part).

Contrary to the majority's assertion, I am not urging a wholesale departure "from our well-established precedent." Rather, I am reiterating my view that it is time to revisit *Ramseur,* a decision rooted in conclusions about "evolving standards of decency" vis-à-vis the death penalty, to take into account changes in our collective consciousness since it was decided.

Indeed, as *amici* point out, a recent survey by the highly respected Eagleton Center for Public Interest Polling, a project of the Institute of Politics of Rutgers University, provides compelling evidence that community consensus against the death penalty is continuing to evolve. Eagleton Institute of Politics, New Jersey-

ans' Opinions on a Death Penalty Moratorium (May 2002) [hereinafter Eagleton Survey].

The study, based on interviews conducted with 803 New Jersey residents in May 2002, evinces a significant decrease in support for the death penalty. It shows that 60 percent of New Jersey residents support the death penalty as punishment for murder. *Id.* at 1. Sixty-three percent supported it when the issue was studied in 1999. *Id.* at 2. When we last considered the constitutionality of the death penalty, the then most recent surveys, conducted in 1977 and 1981 by the Eagleton Poll, showed public support for this State's death penalty at 72 percent. *See State v. Ramseur,* 106 *N.J.* 123, 174 n. 10, 524 *A.*2d 188 (1987).

When presented with the alternative of life in prison without parole, the public's support for the death penalty dropped to 36 percent, down from 44 percent in 1999. Eagleton Survey at 3. Moreover, as in prior years, New Jersey residents are less likely than other Americans to prefer the death penalty over life in prison without parole. *Ibid.* In addition, 66 percent of New Jersey residents—including 60 percent of those who favor the death penalty overall—favor a temporary halt to executions while a study is conducted to ascertain whether the death penalty is being administered accurately, fairly, and economically. *Id.* at 4.

The majority's reliance on our legislature's inaction regarding the death penalty as "the best and most reliable indicator" of contemporary values is mysterious in light of its citation to the recent United States Supreme Court decision in *Atkins v. Virginia,* —— *U.S.* ——, 122 *S.Ct.* 2242, 153 *L.Ed.*2d 335 (2002), which held, among other things, that a national consensus has developed in the last thirteen years against the execution of mentally retarded persons.[1] Despite that national consensus, our capital legislation still authorizes the execution of the mentally retarded, indicat-

---

[1] Since the decision in *Penry v. Lynaugh,* 492 *U.S.* 302, 109 *S.Ct.* 2934, 106 *L.Ed.*2d 256 (1989), at least sixteen states have joined Georgia, Maryland, and the federal government in enacting statutes that prohibit such executions.

ing that, at least as far as the United States Supreme Court is concerned, our legislature is out of synchronicity with "evolving standards of decency." *Id.* at ——, 122 *S.Ct.* at 2247, 135 *L.Ed.*2d at —— (quoting *Trop v. Dulles,* 356 *U.S.* 86, 100–01, 78 *S.Ct.* 590, 598, 2 *L.Ed.*2d 630, 642 (1958)).

I am equally puzzled over the majority's suggestion that the "actions of juries" support its conclusion that community standards have not undergone a sea change. The statistics cited by the majority are meaningless unless they are compared to previous numbers:

> One final observation regarding contemporary standards of decency involves *Ramseur's* conclusion that it is "a true reflection of society's morality" that twenty-six juries in New Jersey imposed the death penalty from 1982 to 1987. 106 *N.J.* at 173, 524 *A.2d* 188. Based on that figure, if public standards remained constant, at least sixty-two death sentences would have been expected between 1987 and 1999. In fact, only twenty-six death sentences were imposed during that period, Hon. David S. Baime, *Report of the Special Master on Proportionality Review: State v. Thomas Koskovich* 1a (Jan. 24, 2000), obviously reflecting a diminishing level of support for that extreme sanction among our fellow citizens.

> [*State v. Koskovich,* 168 *N.J.* 448, 580, 776 *A.*2d 144 (2001) (Long, J., concurring in part and dissenting in part).]

Coupled with what we now know about the death penalty's failure to deter criminals, those changed circumstances underscore the need to reconsider *Ramseur. See, e.g.,* Raymond Bonner & Ford Fessenden, *States With No Death Penalty Share Lower Homicide Rates,* N.Y. TIMES, Sept. 22, 2000 ("homicide rates had risen and fallen along roughly symmetrical paths, suggesting to many experts that the threat of the death penalty rarely deters criminals").

I remain mystified by the Court's resistance to revisiting a fifteen-year-old opinion that, by its very terms, was rooted in conclusions about the public's appetite for the death penalty that appear to have changed. The suggestion that the Court's past perfunctory rejection of equally perfunctory challenges to *Ramseur* over the years gives currency to that opinion is neither jurisprudentially sustainable nor an appropriate response to a case

involving the ultimate sanction of death. *Ante* at 138, 803 *A*.2d at 1130.

*For affirmance in part, reversal in part & remandment*—Chief Justice PORITZ and Justices STEIN, VERNIERO, LaVECCHIA and ZAZZALI—5.

*Concurring in part and dissenting in part*—Justices COLEMAN and LONG—2.